[Civ. No. 15893. First Dist., Div. One. Jan. 26, 1954.]

REDEVELOPMENT AGENCY OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners, v. J. JOSEPH HAYES, as Chairman of Redevelopment Agency, etc., Respondent; FLORENCE VAN HOFF et al., Interveners.

Dion R. Holm, City Attorney, John Elmer Barricklo and Morley Goldberg, Deputy City Attorneys, and William A. O'Brien, for Petitioners.

Edmund G. Brown, Attorney General, and Eugene B. Jacobs, Deputy Attorney General, as Amici Curiae on behalf of Petitioners.

Rose M. Fanucchi for Respondent.

Jack H. Werchick for Interveners.

BRAY, J.—Petition for writ of mandate to compel respondent chairman of petitioner Redevelopment Agency of the City and County of San Francisco* to execute certain loan and grant contracts with the United States of America.

### QUESTIONS PRESENTED

1. Have interveners the right to intervene?
2. Constitutionality of the Community Redevelopment Law (Health & Saf. Code, pt. I, div. 24, §§ 33000-33954)† as applied to (1) slum clearance, (2) blighted area.

### RECORD

Respondent demurred and in answer to the petition denied none of the facts set forth in the petition, but based his refusal to execute the contracts on the alleged grounds of the unconstitutionality of the act. Two taxpayers in the Diamond Heights Area, Florence Van Hoff and Victor Berg, on behalf of themselves and all others similarly situated, filed a complaint in intervention in which they demurred to the sufficiency of the

---

*Hereafter referred to as "the Agency."
†Hereafter referred to as "the act."

petition on the ground that the proposed proceedings of the Agency are prohibited by the Fourteenth Amendment to the United States Constitution, and article I, sections 1, 11, 13, 14, 14½, 21; article III, section 1, and article IV, sections 24, 31, of the California Constitution. They also answered, denying certain allegations of the petition. Thereupon petitioners demurred to the complaint in intervention both generally and specially and on the ground that interveners have no right to intervene. Petitioners also moved to strike the whole and all parts of the complaint in intervention on the grounds of interveners' lack of right and that the complaint is sham, irrelevant and argumentative. At the hearing, interveners' demurrer to the petition and petitioners' demurrer to, and motion to strike, the complaint were submitted.

PETITION

The petition sets forth that the Agency is a public body corporate and politic created under the act, after a declaration of the board of supervisors of the need for such agency, and the fact that the city had satisfied the "Community Prerequisites" of the act in that the city's Planning Commission has a master plan which includes all the matters required by the act to be in such plan. The Agency has undertaken a program for the elimination and redevelopment of blighted areas, of which the first two are the ones to be considered here, one being known as Western Addition Project and the other as Diamond Heights Project. The petition then gives the steps taken antecedent to the formulation of the redevelopment plans for both projects. As no attack is made on the regularity of those proceedings, they need not be detailed.

Certain facts are then alleged as to each area. Western Addition is a blighted area which constitutes both a social and economic liability requiring redevelopment in the interest of the health, safety and general welfare of the people of the city and state. It includes approximately 28 blocks and is characterized by buildings used wholly or in part for residential purposes, which because of age, obsolescence, deterioration, dilapidation, mixed character and shifting uses, are unfit and unsafe for occupancy, and conducive to ill health, infant mortality, juvenile delinquency and crime. There are more than 2,000 substandard dwellings and hundreds of rooms in dilapidated rooming houses and row dwellings. More than 60 per cent of the dwelling units are dilapidated or lack private baths; more than 40 per cent have more than twice as many families than originally planned for; more than 50 per

cent have inadequate toilet facilities; many lack installed heating; general use of portable coal oil heaters and storage of inflammable material constitute fire hazard; inadequate fire escape and exits add to the hazard of the inhabitants; extreme overcrowding is three and one-half times more prevalent in the area than in the city as a whole. The correction of these blighted conditions cannot be accomplished without redevelopment of the area as a whole, nor by private enterprise alone and without public participation. All of these conditions and this fact have been found by resolution and ordinance of the board of supervisors.

Diamond Heights is a blighted area constituting a social and economic liability requiring redevelopment in the interest of health, safety and general welfare. It includes approximately 325 acres. Much of the area was subdivided in 1863 and 1864; only 15 per cent of the area is occupied or used; 4 per cent is in improved boundary streets; 5 per cent playgrounds; less than 6 per cent interior streets and dwellings. Such unuse and lack of development is due to lots of irregular form and shape having been laid out without regard to the contours and other physical characteristics of the ground such as cliffs, steep gradings and outcroppings of rock; more than 500 parcels are in separate ownership which makes it impossible to effectively assemble the land by private means without public assistance and exercise of the power of eminent domain; there is wasteful street design, unsuited and unadapted to the topography of the area; mapped streets of usable grade are connected with mapped streets of unusable grade, so steep as to render impossible the construction of usable streets; one-third of said streets are too steep to be usable; 66 acres of such mapped streets remain unpaved and undeveloped, there being only 1.4 acres of paved streets. The major portion of the area is unserved by utilities of any kind; existing public open spaces would be inadequate to serve the area if built up. Approximately 85 per cent of the area is vacant and undeveloped; 115 acres are in private ownership, of which only 17.8 acres are improved with houses, the remainder of the private ownership improvements consisting of truck yards, deteriorated sheds and two quarries. As a result of said faulty planning there is an economic dislocation and disuse of the area; a subdivision of lots into irregular form and shape and inadequate size for proper use and development; a layout of lots in disregard of the contours and other

physical characteristics of the ground and surrounding conditions; nonexistence of adequate streets and utilities in the area. The area is characterized by the growing or total lack of proper utilization resulting in stagnant and unproductive condition of land potentially useful and available for contributing to the public health, safety and general welfare. The blighted condition is aggravated by the shortage of useful land in the city for residential development to alleviate the acute housing shortage and tends to render the lands unmarketable and thereby to force an abnormal pattern of residential growth.

Redevelopment is necessary to facilitate the redevelopment of congested, deteriorated areas in other sections of the city, particularly in Western Addition. Correction cannot be accomplished without redevelopment of the areas as a whole. This cannot be done by private enterprise alone without public participation and assistance. All of the above has been found by the board of supervisors by resolution and ordinance. Interveners admit the factual characteristics of the area but deny the conclusions and point out that for a long time past 210 acres have been and still are in public ownership.

The redevelopment of both projects requires (1) acquisition of lands by purchase or eminent domain, (2) demolition and clearance, (3) vacation and abandonment of certain street areas and dedication of other areas for street widening and other improvements and the consolidation of certain blocks into continuous land areas, (4) rough grading and installation of necessary site improvements and utilities, (5) replatting and zoning in conformity with the city's master plan, (6) disposition of said lands as improved by sale under suitable safeguards, restrictions, covenants and conditions as set forth in certain ordinances. Such redevelopment will eliminate the blight conditions alleged by providing: clearance, elimination and prevention of slum and blighted areas; a proper, well-planned, economic utilization of said areas; adequate open spaces; utilities; streets designed to carry fast through traffic while closing off traffic on other streets, thereby contributing to the safety of the inhabitants of the areas; school, shopping and other community facilities; improved lands near the center of the city for the construction of needed dwelling units; a substantial increase in the number of safe and sanitary dwelling units to ease the acute housing shortage.

Title I of the Housing Act of 1949 (P. L. 171, 81st Congress, 42 U.S.C. § 1451 et seq.) authorizes certain financial

assistance to petitioners to aid in this redevelopment. Pursuant to applications filed by the Agency with the Housing and Home Finance Administrator, the administrator has advanced to the Agency $517,160.82, in addition to which the city has provided $78,962 to the Agency. On June 4, 1953, the Agency adopted a resolution directing respondent, as its chairman, to execute on behalf of the Agency a contract with the United States of America for a loan of $16,022,000 and a capital grant of $6,012,000 to aid in financing Western Addition Project and a contract for the loan of $5,049,000 and a capital grant of $334,000 to aid in financing Diamond Heights Project, both of which contracts have been approved by the board of supervisors. To satisfy the requirements of said contracts the city has undertaken to provide local grants-in-aid of $3,279,600 for Western Addition and $2,711,000 for Diamond Heights. The contracts have been executed by the administrator but respondent refuses to execute them.

Accompanying the petition are exhibits containing the various resolutions and ordinances of the board of supervisors, the tentative plans of the projects, reports on and photographs of the areas and other data.

1. RIGHT TO INTERVENE.

■ Interveners are taxpayers of the city and county of San Francisco and residents and property owners in the Diamond Heights area. Obviously they have "an interest in the matter in litigation" (Code Civ. Proc., § 387) and therefore may be permitted to intervene. In *People ex rel. Fogg* v. *Perris Irr. Dist.,* 132 Cal. 289 [64 P. 399, 773], it is held that an intervener is entitled to all the procedure and remedies to which the respondent would be entitled to resist petitioner's claims. In *Boskowitz* v. *Thompson,* 144 Cal. 724 [78 P. 290], it is held that the intervener is "limited to the same procedure and remedies as is such original party." In *Wright* v. *Jordan,* 192 Cal. 704, it is stated (p. 714 [221 P. 915]) : "As to the interveners herein it will suffice to say that while they were permitted to intervene to the extent and for the purpose of sustaining or opposing the respective contentions of the petitioners and respondent herein, their rights as interveners herein go no further, since they cannot be heard to broaden the scope or function of this special proceeding by urging claims or contentions which have their proper forum elsewhere, and in which forum they are already embattled."

In our case respondent expressly raises no issue on the facts set forth in the petition. Interveners in their complaint admit most of these facts although they strenuously deny the conclusions drawn by petitioners therefrom. Under the situation in this case and because of the limited facilities of this court to conduct a trial on factual issues, we deem it unnecessary to determine whether we have the power to permit interveners to raise issues of fact, but deem it better to confine the issues to those of law, leaving the factual issues, if any, to be determined in a tribunal better adapted to trying them. Therefore we will grant petitioners' motion to strike all of the complaint in intervention except those portions constituting a demurrer.

2. CONSTITUTIONALITY.

(a) *Slum Clearance.*

Although the two projects are a part of one program (undoubtedly other similar projects are to follow) the character of the two areas proposed to be redeveloped are radically different. While the attack on the constitutionality of the act is basically on the fact that after the taking of private property by the power of eminent domain, if necessary, and after its redevelopment, it is to be sold to private persons, the difference in character of the areas presents different legal problems. Therefore we will consider the projects separately.

Clearly, Western Addition is a blighted area of the type usually referred to as a "slum." ■■■ " 'It is generally accepted that a slum area is one, which because of lack of adequate open spaces and community facilities, and because of a preponderance of substandard buildings, does not provide an environment in accordance with the accepted standard of urban neighborhood life.' " (Dissenting opinion of Van Voorhis, J., in *Kaskel* v. *Impellitteri* (N.Y.), 115 N.E.2d 659, 670, quoting from report of William G. Vladeck, Chief of Planning of the New York City Housing Authority.) ■■■ Likewise, it comes within the definition of blighted area given in section 33041, Health and Safety Code: "A blighted area is characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors:

"(a) Defective design and character of physical construction.

"(b) Faulty interior arrangement and exterior spacing.

"(c) High density of population and overcrowding.

"(d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities.

"(e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses."

Statutory or constitutional provisions authorizing local public agencies to undertake urban development projects for slum clearance have been adopted in at least 37 states.* Their validity has been almost uniformly upheld.†

The precise question involved here has never been passed on in this state. The fact that the elimination of slums and the erection of safe and sanitary low-rent dwelling units for persons of the prescribed restricted income advances the public welfare and protects the public safety and morals and are in fact and law public purposes was determined in *Housing Authority* v. *Dockweiler*, 14 Cal.2d 437 [94 P.2d 794]. There the constitutionality of the Housing Cooperation Law (2 Deering's Gen. Laws [1938] Supp., Act 3484) including the right of the public agency to use the power of eminent domain for slum clearance was upheld. That act, however, did not contemplate resale of the property condemned. Community Redevelopment Laws practically similar to our act in other states in their slum clearance aspects have been upheld with two exceptions. In the following cases the statute applied provided for the use, if necessary, of the power of eminent domain to obtain slum areas, their redevelopment and their sale and/or lease to private persons. In practically all of them the same federal constitutional questions were raised as in our case. In many of them the same questions were raised as to the particular state constitution as are raised as to the California Constitution in our case. In all of these cases the particular statute was upheld. These cases are: *Opinion of the Justices* (1950), 254 Ala. 343 [48 So.2d 757]; *Rowe* v. *Housing Authority* (1952), 220 Ark. 698 [249 S.W.2d 551]; *Zurn* v. *City of Chicago* (1945), 389 Ill. 18 [59 N.E.2d 18]; *People ex rel. Tuohy* v. *City of Chicago* (1946), 394 Ill. 477 [68 N.E.2d 761]; *People ex rel. Tuohy* v. *City of Chicago* (1948), 399 Ill. 551 [78 N.E.2d 285]; *Chicago Land Clear-*

---

*See list in *Kaskel* v. *Impellitteri, supra,* 115 N.E.2d at p. 670.

†See list of authorities, *idem,* 115 N.E.2d at p. 670.

*o*

*ance Com.* v. *White* (1952), 411 Ill. 310 [104 N.E.2d 236];
*In re Slum Clearance in City of Detroit* (1951), 331 Mich.
714 [50 N.W.2d 340]; *State ex rel. Bruestle* v. *Rich* (1953),
150 Ohio St. 13 [110 N.E.2d 778]; *Belovsky* v. *Redevelopment
Authority* (1947) 357 Pa. 329 [54 A.2d 277, 172 A.L.R. 953];
*Opinion to the Governor* (1949), 76 R.I. 249 [69 A.2d 531];
*Ajootian* v. *Providence Redevelopment Agency* (1952), ——
R.I. —— [91 A.2d 21]; *Nashville Housing Authority* v. *City
of Nashville* (1951), 192 Tenn. 103 [237 S.W.2d 946];
*Foeller* v. *Housing Authority of Portland* (1952), 198 Ore.
205 [256 P.2d 752]; *Hunter* v. *Norfolk Redevelopment &
Housing Authority* (1953), —— Va. —— [78 S.E.2d 893].

The only cases which have failed to uphold statutes similar
to ours are *Adams* v. *Housing Authority of City of Daytona
Beach* (1952), —— Fla. —— [60 So.2d 663], and *Housing
Authority of City of Atlanta* v. *Johnson* (1953), 209 Ga. 560
[74 S.E.2d 891]. The majority opinion in the Florida case
determined that the Florida Housing Authority Act which
authorized slum clearance followed by the construction of
housing for people of small income was not to provide housing
but to authorize the acquisition of property in slum areas
so that it could be sold to private investors for industrial
uses. It acknowledged that redevelopment acts "have been
upheld by some of the courts of last resort of other states"
(p. 665) without citing any decisions or discussing them. It
then stated: "We have our own Constitution and adjudi-
cated cases by this Court which are controlling . . ." In
the Georgia case the public authority was to acquire slum
property, remove the buildings from it and then sell the
unimproved property to industrial enterprises. The court
after referring to the fact that it had previously sustained
as valid the Georgia Housing Authorities Law "not without
some misgivings on the part of some members of the court"
stated: "We know that some courts of other jurisdictions
have held that this can be done, and others have held that
it cannot be done. What constitutes a 'public use' under
the Constitution and laws of Georgia is a question that must
be decided by the courts of this State, and what some other
jurisdiction may have decided is in no way binding."
(P. 893.) The decision neither cited nor discussed the deci-
sions which it mentioned. The court apparently was influ-
enced in its decision by the fact that the act did not require
new housing to be erected on the slum area before turning it
over to private interests. That the court is not in step with

modern judicial thought is indicated by its rejection of the argument that removal of slums might decrease juvenile delinquency by saying, "We think juvenile delinquency exists on both sides of the railroad tracks . . ." The two cases last mentioned are not even persuasive authority in the face of the above-mentioned weight of authority.

The latest cases on the subject are *Kaskel* v. *Impellitteri, supra,* 115 N.E.2d 659, and *Schneider* v. *District of Columbia,* 117 F.Supp. 705.* In the Kaskel case the validity of proceedings for redevelopment of the "substandard and insanitary" Columbus Circle area in New York City was upheld. The Schneider case, decided November 5, 1953, contains a well-reasoned discussion of the questions arising from the application of the District of Columbia Redevelopment Act, an act quite similar to our act. The Schneider case was actually two cases consolidated for trial, each dealing with a different type of area, one a slum area, and the other an area somewhat comparable to our Diamond Heights area. As applied to the slum area the court held the District of Columbia Redevelopment Act valid. We will discuss its application to the other area when we discuss the Diamond Heights problem. The main attack made on the District of Columbia act, as is the attack here, was that it authorized the taking by eminent domain of the fee title to private property and the sale or lease of that title to other private persons for private use. The court first pointed out that there is no doubt of the power of Congress to delegate to the district government the power to clear slums, such power lying within the well-established concepts of police power, namely, the protection of the public health, safety, morals and welfare, and that the clearance of slums is a public purpose to which the power of eminent domain applies. Moreover, it may be exercised not only to eliminate present slums but to prevent future slums. ■ It should be pointed out here that the power of eminent domain applies only to the taking of property for a "public use." Originally the definition of "public use" was very narrowly restricted. Even low cost public housing which is now universally accepted as a public use, originally would have not been included in the definition. As pointed out in the Schneider case, the more modern courts have enlarged the traditional definition of public use to

*Before Prettyman, Circuit Judge, and Curran and Keech, District Judges, sitting as a statutory three-judge court.

include "public purpose." The idea now is that the taking of the property itself, as distinguished from the subsequent use of that property, may be required in the public interest. The case then holds that the taking of real property for the public purpose of eliminating or of preventing slums is within the power of eminent domain, even though the use to which the property is put after seizure is not a public use, provided (1) that the seizure of the title is necessary to the elimination of the slum, or (2) that the proposed disposition of the title may reasonably be expected to prevent the otherwise probable development of a slum. Ordinarily, title to real estate cannot be seized by the public body "merely because a slum presently exists upon the land. Some further necessitous circumstance must exist to validate such a seizure. It must be either that the clearance of the slum is impracticable without taking the title to the land or that proposed restrictions which can be imposed only through the medium of a resale are fairly calculated to prevent recurrence of slum conditions." (Schneider case, p. 717.) The Western Addition Project meets this test.

The Legislature has declared that slum conditions are injurious to the public health, safety, morals and welfare, and that to eliminate substandard housing and other slum conditions acquisition of property by eminent domain is necessary. Here the city and the agency officials to whom the Legislature has delegated the authority to determine whether such conditions exist and what property is necessary to be taken for the public purpose of eliminating those conditions have acted. We find nothing in the record to indicate that their determination is unreasonable or beyond their powers.

(b) *Diamond Heights.*

It is not contended that Diamond Heights constitutes a slum area. Its claimed necessity for redevelopment is its economic dislocation and disuse. It comes within the terms of section 33042 of the Health and Safety Code: "A blighted area is characterized by:

" (a) An economic dislocation, deterioration, or disuse, resulting from faulty planning.

" (b) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

" (c) The laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions.

"(d) The existence of inadequate streets, open spaces, and utilities. . . ."*

We have not included subdivision (e) dealing with submerged lots as there are none in the Diamond Heights area.

There are not as many cases dealing with redevelopment statutes concerning deteriorated areas, nor are they as uniform in their decisions as are those concerning slum areas. We have been cited to and found only five cases discussing the subject. The latest is *Schneider* v. *District of Columbia, supra,* 117 F.Supp. 705, which, as we have shown, upheld the validity of the District of Columbia Redevelopment Act as related to slum clearance. However, it held the act invalid as related to deteriorated areas, stating that Congress in legislating for the district has no power to authorize the seizure by eminent domain of property for the sole purpose of redeveloping the area according to its, or its agent's, judgment of what a well-developed, well-balanced neighborhood would be.

The case then considers one further situation, i. e., where a part of the deteriorated area contains slums. It holds that only that portion of the area geographically necessary to the elimination of slums may be taken.

The court distinguishes *Foeller* v. *Housing Authority of Portland, supra,* 256 P.2d 752, and *Schenck* v. *City of Pittsburgh, infra,* 364 Pa. 31 [70 A.2d 612], in both of which cases the properties seized were developed for nonresidential purposes, by pointing out that in each case the seizure and resale of the properties was a clear method of serving two purposes, (1) to prevent the recreation of slums, and (2) to enlarge the potential activity upon which the city lived. The court seemed to consider that the first purpose could exist alone but that the second purpose must be concomitant with the first. It referred to *Fallbrook Irr. Dist.* v. *Bradley* (1896), 164 U.S. 112 [17 S.Ct. 56, 41 L.Ed. 369], which involved an irrigation act of the State of California and the question was whether the construction of irrigation works is a public purpose, and also to *Clark* v. *Nash* (1906), 198 U. S. 361 [25 S.Ct. 676, 49 L.Ed. 1085], where the doctrine of the Fallbrook case was applied to an irrigation project in the

---

*The statute includes both this type of area and slum areas under the term "blighted area." For brevity and in order to distinguish slum areas factually from areas of the type of Diamond Heights we will refer to the latter as "deteriorated" areas, not as a word of description but merely as a word of reference.

state of Utah, although the project, authorized by a state statute, was the condemnation of land by an individual for the purpose of irrigating his own land, and other cases. Concerning these and the Foeller and Schenck cases, *supra,* the court said that the basis of the decisions was "meeting a compelling community economic need is a public purpose." It then referred to *People of Puerto Rico* v. *Eastern Sugar Associates* (1946), 156 F.2d 316, certiorari denied 329 U.S. 772 [67 S.Ct. 190, 91 L.Ed. 664], which considered a statute of the insular Legislature embodying a far-reaching program of agrarian reform designed to remedy desperate economic conditions existing in the islands. The act authorized the seizure of large holdings of land used for the raising of sugar, especially that owned by corporations, and the redistribution of the land to individuals in small parcels. The statute was upheld upon the public necessity for solution of the general and acute conditions and upon the conclusion that the statute was reasonably calculated to deal with these problems.

Thus, the Schneider decision recognizes that property may be taken for redevelopment for other than purely slum clearance purposes, namely, to meet a compelling community economic need. The case then considers whether as to the nonslum area in the District of Columbia the proposed taking was to meet such need. It states that the redevelopment plan is based on the opinion of its proponents that residential neighborhoods should be "well-balanced" and that the area should contain housing for all income groups. It points out that "No acute housing shortage is to be met"; in fact, the plan contemplates no more residents after redevelopment than now. "No pressing economic condition" is shown. No purpose of housing for the needy is shown. "No rearrangement of streets is contemplated," the streets in the project area being continuous lines of the streets in other parts of the District of Columbia. "In sum the purpose of the plan, in addition to the elimination of slum conditions, is to create a pleasant neighborhood, in which people in well-balanced proportions as to income may live." The court then states: "But as yet the courts have not come to call such pleasant accomplishments a public purpose which validates Government seizure of private property. The claim of Government power for such purposes runs squarely into the right of the individual to own property and to use it as he pleases. Absent impingement upon rights of others, and absent public use or compelling public necessity for the property, the individual's

right is superior to all rights of the Government and is impregnable to the efforts of government to seize it. That the individual is in a low-income group or in a high-income group or falls in the middle of the groups is wholly immaterial. One man's land cannot be seized by the Government and sold to another man merely in order that the purchaser may build upon it a better house or a house which better meets the Government's idea of what is appropriate or well designed." It should be noted that the act involved in the Schneider case (60 Stats. 790) refers only to "substandard housing and blighted areas." It contains no definition of "blighted area" similar to that contained in section 33042, Health and Safety Code.

We are in accord with the Schneider decision that where no compelling community economic need is shown, the power of eminent domain may not be used. As hereafter shown, there appears to be such need in Diamond Heights.

The next most recent case is *Kaskel* v. *Impellitteri, supra,* 115 N.E.2d 659. There the appropriate New York municipal body proceeded under section 72-k of the General Municipal Law to find that a Columbus Circle area was "substandard and insanitary" and to plan a project for the removal of all buildings in it, redevelop it and then sell or lease portions of the area to private concerns. A taxpayer brought suit contesting the finding that the area was substandard and insanitary and asked that a court trial be had to determine that question. The majority opinion which held that as there was ample evidence to justify the City Planning Commission's findings and there was no charge that it acted corruptly or arbitrarily, the courts could go no further into this subject, adopts the minority opinion on all other questions in the case. It is held that the statute providing for slum clearance (§ 72-k of the General Municipal Law) is constitutional but can only be applied if the project is primarily for slum clearance. The minority opinion was to the effect that there was evidence supporting the plaintiff's claim that the area was not a slum area and slum clearance was not the primary object of the project but was secondary to turning the property over to private enterprise for the construction and operation of a sports coliseum; therefore, the case should be tried to determine the true factual situation.

*People* v. *City of Chicago, supra,* 111 N.E.2d 626 (March, 1953), involved the validity of the 1949 amendments to the

Illinois Blighted Areas Redevelopment Act of 1947. As originally enacted that act was limited to "slum and blighted" areas—in substance, what we have considered here "slum areas" only—provided for their elimination and the construction of redevelopment projects financed by private capital. The amendment broadened the definition of "blighted areas" to include practically the same conditions set forth in section 33042 of the Health and Safety Code. Following the procedure provided in the act the Chicago Land Clearance Commission determined a certain 40-acre area to be blighted. Thereupon a private corporation submitted to the commission a redevelopment plan whereby it was to acquire the property, construct dwelling units thereon and sell them to private buyers. This plan required the use of public funds and the power of eminent domain. A quo warranto proceeding was brought to determine the validity of the amendment and the proposed procedure. No attack was made on the act as originally enacted as its validity had been sustained in *People ex rel. Tuohy* v. *City of Chicago, supra,* 78 N.E.2d 285, and *Chicago Land Clearance Com.* v. *White, supra,* 104 N.E.2d 236. While there is mention of slum eradication in the case, a study of it indicates that the question presented was clearly whether the acquisition of vacant land areas by a public agency for subsequent sale to private interests for development for residential use was an acquisition for a public use or public purpose permitting eminent domain to be employed. There was no slum condition in the area to be taken. The tie-in with slum eradication is based upon the statement that the development of areas for providing additional housing is necessary as an adjunct of clearing slum areas. "So far as we are aware, this is the first case in which governmental efforts to deal with unmarketable areas of vacant land have received judicial consideration . . . What is involved here is, by the definition of the statute, an area which, because of characteristics of scattered ownership, undesirable platting, deteriorated site improvements, or excessive tax delinquencies, has in fact become unmarketable and because of its unmarketability has distorted the normal development of the community.

"The deleterious effect of such areas has been recognized by the Congress which has provided for Federal assistance in eliminating 'land which is predominately open and which because of obsolete platting, diversity of ownership, deterioration of structures or of site improvements, or otherwise sub-

stantially impairs or arrests the sound growth of the community . . ..' (42 U.S.C.A., par. 1460.) In the statute here involved, and in another statute known as the Blighted Vacant Areas Development Act of 1949 (Ill. Rev. Stat. 1949, chap. 67½, pars. 91.1-91.7), the General Assembly of Illinois has recognized that such vacant areas in their present condition are incapable of development for housing purposes by private enterprise. They are characterized as economic, social and physical waste lands, the elimination and development of which is declared to be a public use." (P. 634.)

The court then held that the amendment was valid and constitutional. "The purpose and use to which the vacant blighted property is to be taken is both a public purpose and a public use, since the taking tends to alleviate a housing shortage, is an essential aid and adjunct to slum clearance, removes hazards to health, safety, welfare and morals of the community by developing the area, and eliminates factors impairing and arresting sound community growth." (P. 635.)

The minority opinion points out that the majority opinion holds that the acquisition of vacant land and its development for residential uses even though unrestricted to low-rent accommodations is sufficiently related to the subject of slum clearance as to constitute the taking of land for a public use, a holding with which the minority opinion disagrees.

*Foeller* v. *Housing Authority of Portland, supra,* 256 P.2d 752 (1952), was brought to determine the validity of Oregon's Urban Redevelopment Law. While the project under consideration there was to take an area 53.8 per cent residential and redevelop it into an area completely commercial or industrial, the court held that the primary purpose was to prevent the development of slum conditions in that area. The case cannot be considered authority as to the situation where the area to be taken is a deteriorated one solely.

Thus we find that the only case which upheld the validity of a redevelopment statute as applied to a nonslum area is the City of Chicago case, and even in that case the court felt constrained to tie in the principle of the slum clearance cases by stating that providing additional housing was an adjunct of slum clearance. This constitutes a very elastic tie, for, based on that theory, any project of redevelopment could be supported as slum prevention if only it provided additional housing.

However, it appears from the cases on eminent domain dealing with a new subject to which the power is attempted

to be applied that the right to its use depends upon what is referred to in the Schneider case as a "compelling community economic need." Our task, then, is to determine first whether the act is based on such a requirement, and secondly, whether in its application to the Diamond Heights Project such a need is shown. As to the basis of the act—in addition to sections 33041 and 33042, Health and Safety Code, heretofore quoted, there are a number of other significant sections. Section 33040 finds that in many communities there exist blighted areas which constitute social or economic liabilities, requiring redevelopment in the interest of the health, safety and general welfare of the people. These blighted areas are characterized by one or more of the conditions set forth in sections 33041-33044, inclusive. Section 33043 additionally characterizes a blighted area by a prevalence of depreciated values, impaired investments and social and economic maladjustments reducing the capacity to pay taxes so that tax receipts are inadequate for the cost of public services rendered. Section 33044 additionally characterizes a blighted area as one where in some parts a growing or total lack of proper utilization of areas results in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety and welfare. The section further refers to a loss of population and reduction of proper utilization of the area, resulting in its further deterioration and added costs to the taxpayer for the creation of new public facilities and services elsewhere. Section 33045 declares the policy that the existence of blighted areas characterized by any or all of the conditions in the preceding sections constitutes a rising menace to public health, safety and welfare, cannot be remedied by use of the police power, necessitates excessive expenditures, and their removal is of benefit to the local population and property owners. Section 33046 continues the declaration of policy that such conditions cause continuing deterioration and disuse, that the blight cannot be corrected except by redeveloping the entire area, or substantial portions of it, that there is an impracticability of private assembly of small parcels in scattered ownership, and as a practical matter is so difficult and costly and lacking in legal power as to make it impossible to remedy by private owners. The only practical remedy is by public acquisition, clearance and planned redevelopment. Section 33047 declares that to protect and promote the sound development and redevelopment of blighted areas and the general welfare, these conditions

should be remedied by all appropriate means including the expenditure of public funds and the use of eminent domain, and that the necessity of redevelopment in the interests of health, safety and welfare of the people is a matter of legislative determination.

We do not deem it necessary to determine whether if only one of the designated conditions characterizing a blighted area under the statute exists, the statute could be enforced, as that question is not before us. ■ However, it is clear that a combination of many of them establishes a menace to the health, safety and general welfare of the people of the community, and if such menace cannot be removed by private capital or police power, and requires redevelopment as outlined in the act, there would then exist a compelling community economic need.

APPLICATION TO DIAMOND HEIGHTS PROJECT

This brings us to the question as to whether the petition shows a compelling community economic need for the project. Accompanying the petition are a series of exhibits setting forth the proceedings taken by the various city and county authorities, plans of the project, reports considered, maps of the present areas, and maps showing the projected uses to be made of the area. From these, it appears that the board of supervisors found, based upon substantial evidence, that the Diamond Heights area is a blighted one characterized, at least, by the conditions set forth in sections 33042(a) to (d), inclusive, 33044, 33045, 33046 and 33047.

The record shows that approximately 85 per cent of the area consists of vacant land which is in a state of economic disuse because private enterprise in the absence of governmental assistance cannot redevelop it in the community interest. This is due to the gridiron pattern of streets of approximately 66 acres of unimproved streets not adapted to the contour of the land, unsuited to the topography and too steep to be usable; to the fact that lots of irregular form and shape, many of them excessively long and narrow, have been laid out in disregard of the contours and other physical characteristics of the ground such as cliffs, outcroppings of rock, and steep grades. There are 500 lots owned by separate individuals whose holdings vary in size from lots of 25 feet width to parcels of half an acre. Only 15 per cent of the area is used. There is a shortage of land in San Francisco and the welfare of the people requires that this unproductive

area be used for dwelling and public places. In many instances the blighted condition of the area has resulted in sale of property to the state for delinquent taxes. The tentative plan shows that other than the public places the redevelopment is to be predominantly residential, consisting of single-family houses and multifamily houses. Open space, commercial, public (firehouse, schools, park, playgrounds), institutional (churches, nursery schools, community buildings) and other uses are planned. It is not sufficient to say that the streets can be changed by ordinary eminent domain and street proceedings. Because of the peculiar layout of the streets as now shown on the map, the cost of abandonment proceedings and eminent domain proceedings would practically be prohibitive for, because of the many ownerships and the irregularity of the parcels, the cost of the taking and the resultant damage to the parts not taken would nearly equal the entire value of the private areas. While a large part of the area is in public ownership and could be developed by the authorities, it is so broken and interspersed with private ownerships as to require a consideration of the whole area. ■ While probably no one element of the blight is sufficient to justify the taking by eminent domain, the combination of a great and pressing demand for more housing, the correlation of the area with other areas of the city, by streets and public places, the fact that without governmental help the area cannot be developed and will continue to deteriorate, together with all the circumstances shown by the record, demonstrate the compelling community economic need required to permit the application of the act.

Interveners contend that there is no necessity for the proposed Diamond Heights plan inasmuch as the private owners have had no opportunity to develop the area because 65 per cent of it has been held by public agencies, and the failure of the latter to act is a cause of the present condition. They claim that the area could have been developed many years ago when building costs were lower, the labor supply was more abundant, materials more available, and loans for construction were available at much lower rates. Regardless of the reason for the condition, and what might have been done, we are confronted with the present condition. ■ Interveners contend that there is no demand for dwellings of the class contemplated by the plan. This question is one for the city and the Agency to determine.

TITLE OF THE ACT

All of the points raised against the validity of the act have already been determined in the cases herein cited. However, we will discuss in more detail these points, without attempting to cite all the cases considering the particular point. ■ Thus the claim that the act embraces more than one subject which are not expressed in the title—"An act to consolidate and revise the law relating to community redevelopment and housing for the preservation of the public health and safety, and the formation, regulation, and operation of corporations therefor, by adding Division 24 and Section 40021 to the Health and Safety Code, and repealing certain acts specified herein"—is similar to the claim made in *People* v. *City of Chicago, supra,* 111 N.E.2d 626, concerning the Illinois Blighted Area Development Act. The court said (p. 632) : "An act may include all matters germane to its general subject, including the means reasonably necessary or appropriate to the accomplishment of the legislative purpose. . . . To render a provision in the body of a statute void as not embraced in the title, the provision must be one which is incongruous, or which has no proper connection with the title." The court then pointed out that there was an interrelation between all the matters permitted by the act and found that they were germane to the single subject of redevelopment of blighted areas. That case holds that there is an interrelation between slum clearance and the elimination of stagnant vacant areas. Redevelopment, contrary to interveners' contention, is not necessarily confined to the one term "build up," in the sense that it can only be applied to changing a built-up area. All of the matters provided for in our statute are germane to "community redevelopment and housing for the preservation of the public health and safety." "In our opinion, the interrelationships between slum clearance, the revitalization of 'dead' areas like that here involved, and the construction of additional housing which have thus been recognized by Congress, the General Assembly and this court, amply justify the legislature in regarding the matters involved in the present statute as germane to a single subject—the elimination of slums." (*People* v. *City of Chicago, supra,* 111 N.E.2d at p. 633.)

A somewhat similar contention was held unfounded in *Foeller* v. *Housing Authority of Portland, supra,* 256 P.2d 752, the court saying that the act "contains only one subject; that is, the revitalization of blighted areas. All else in the

act is 'properly connected therewith.' " (P. 777.) See also *City of Whittier* v. *Dixon*, 24 Cal.2d 664 [151 P.2d 5, 153 A.L.R. 956], concerning the sufficiency of the Vehicle Parking District Act of 1943.

## PUBLIC PURPOSE

The contention that the proposed Diamond Heights plan does not constitute a public use, is answered in *Oliver* v. *City of Clairton*, Supreme Court of Pennsylvania, March, 1953, 374 Pa. 333 [98 A.2d 47]. While in that case there was some slum clearance involved, it appears that the main attack on the redevelopment plan was that the area was not a blighted one because so much of it was vacant land. There the five acres which were to be redeveloped for heavy industrial purposes, consisted of 58 residential lots which, however, were not actually laid out with open streets; there were seven small buildings in the area, and over 90 per cent of the land was vacant and unimproved. The assessed valuations over a decade had decreased, 15 of the lots were delinquent for many years in taxes, and the ownership of the lots was divided among approximately 22 individuals. Except for the fact that half of the few dwellings involved were substandard or slum grade, the situation was similar in many respects to that in Diamond Heights. Appellant there contended that as a large part of the area consisted of vacant land it could not be treated as blighted area. The court pointed out that, just as is the situation with regard to our act, there was nothing in the Pennsylvania act limiting the certification of blighted areas to improved property, but on the contrary, vacant areas were expressly included. It then stated: "It may be well to point out once more what was said in the Schenck case, 364 Pa. at page 37, 70 A.2d at page 615, that the Urban Redevelopment Law is to be sharply distinguished from the Housing Authorities Law of May 28, 1937, P. L. 955 . . . in that the latter aimed principally at the elimination of undesirable dwelling houses, whereas the Urban Redevelopment Law 'was obviously intended to give wide scope to municipalities in redesigning and rebuilding such areas within their limits as . . . no longer meet the economic and social needs of modern city life and progress.' Redevelopment authorities have the power, therefore, where the conditions prescribed in the act are found to exist, to exercise the right of eminent domain pursuant to a redevelopment proposal even though the redevelopment area may be predominantly open, vacant or unimproved." (P. 52.)

The contention is further answered in *People* v. *City of Chicago, supra,* 111 N.E.2d 626, 633: "Next to be considered is plaintiff's contention that the acquisition of vacant land areas of the type here involved by a public agency, for subsequent sale to private interests for development for residential use, is not acquisition for a public use or a public purpose, and that therefore eminent domain may not be employed and public funds may not be expended. This court has recognized the existence of an acute housing shortage, *Cremer* v. *Peoria Housing Authority,* 399 Ill. 579, 78 N.E.2d 276, and the evidence in this case confirms the continued existence of that shortage. We have held that the expenditure of public funds for the acquisition of land by a public agency to be sold to a private developer for the construction of non-low-rent housing constitutes a public purpose. *Cremer* v. *Peoria Housing Authority,* 399 Ill. 579, 78 N.E.2d 276. In *Zurn* v. *City of Chicago,* 389 Ill. 114, 59 N.E.2d 18, we held that the elimination and redevelopment of slum and blighted areas is a public purpose and a public use regardless of the subsequent sale or lease of the property to private interests after redevelopment had been accomplished. And even more recently, in *Chicago Land Clearance Commission* v. *White,* 411 Ill. 310, 104 N.E.2d 236, we held that a condemnation proceeding under the Blighted Areas Redevelopment Act of 1947 was not a proceeding to acquire land for private purposes merely because a Land Clearance Commission had entered into a contract with a private corporation for the sale of the area after it was acquired. *Chicago Land Clearance Commission* v. *White,* 411 Ill. 310, 104 N.E.2d 236.''

In *Foeller* v. *Housing Authority of Portland, supra,* 256 P.2d 752, it was pointed out that the transformation of an entire area which is struggling against obsolete planning and is otherwise blighted, into one from which all hazards to the city's health, morals and safety have been eradicated and the placing in deeds conveying such portion of the area as may go into private ownership, of conditions and covenants to prevent the recurrence of blight, constitutes a public use of such area. ▉ It must be pointed out that neither esthetic views nor considerations of economic advantage to the community or a combination of both are sufficient to justify the use of eminent domain for redevelopment purposes. The redevelopment program must be necessary to

protect the public health, morals, safety or general welfare through the elimination of blighted areas. (*Opinion to the Governor*, 76 R.I. 249 [69 A.2d 531].)

In *Fallbrook Irr. Dist.* v. *Bradley, supra,* 164 U.S. 112, 163, a case arising in California, it was held that the state's power of eminent domain may be exercised if the taking ''be essential or material for the prosperity of the community . . .''

The act is premised upon the expressly declared policy that elimination of blighted areas of the Diamond Heights type and the redevelopment of such areas along the lines contemplated here are public uses and purposes and are governmental functions of state concern. ▮ As said in *Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437 (dealing with slum clearance for public housing projects), (p. 449) : ''While such a declaration of policy by the legislative branch of the government is not necessarily binding or conclusive upon the courts, it is entitled to great weight and it is not the duty or prerogative of the courts to interfere with such legislative finding unless it clearly appears to be erroneous and without reasonable foundation.''

PUBLIC USE

While in *Gravelly Ford Canal Co.* v. *Pope & Talbot Co.,* 36 Cal.App. 556, 563 [178 P. 150], the court applied the strict definition of ''public use,'' it is significant that in *University of Southern Calif.* v. *Robbins,* 1 Cal.App.2d 523 [37 P.2d 163], the court held that the taking of land by eminent domain by a private institution, the University of Southern California, to be used as a library for its own students, was for a public purpose. In *Tuolumne Water etc. Co.* v. *Frederick,* 13 Cal.App. 498, the court said (p. 503 [110 P. 134]) : ''The courts would not be aiding the great enterprises of the west by adopting a narrow and restricted view of the meaning of the words 'public use' as used by the legislature and in our constitution.'' Both cases advocate an expanded concept of what is use by the public.

*Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437, adopted the broader interpretation as the rule to be followed in this state. It might be pointed out that as our community life becomes more complex, our cities grow and become overcrowded, and the need to use for the benefit of the public areas which are not adapted to the pressing needs of the public becomes more imperative, a broader concept of what is a public use is necessitated. Fifty years ago no court would

have interpreted under the eminent domain statutes, slum clearance even for public housing as a public use, and yet, it is now so recognized. In addition, slum clearance for redevelopment purposes is likewise so recognized. To hold that clearance of blighted areas as characterized by the act and as shown in this case and the redevelopment of such areas· as contemplated here are not public uses, is to view present day conditions under the myopic eyes of years now gone. As said in *Miller* v. *Board of Public Works*, 195 Cal. 477, 488 [234 P. 381, 38 A.L.R. 1479] : ''As the interest of society justifies restraints upon individual conduct, so, also, does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect itself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare.''

*Pennsylvania Mut. Life Ins. Co.* v. *City of Philadelphia* (1913), 242 Pa. 47 [88 A. 904, 49 L.R.A.N.S. 1062], is not applicable. There the court held that taking private property adjoining a parkway merely to resell it to private persons subject to restrictions for '' 'the preservation of the view, appearance, light, air, health or usefulness' '' of the parkway, was not a taking for public use. It pointed out that there have been two different interpretations of ''public use'' in this country, one the broader meaning of ''public utility or advantage,'' the other narrower one of ''use, or right of use, by the public,'' and that it preferred the narrower meaning. However, it indicated that there could be a taking for the purpose indicated if the city were to keep ownership of the property taken rather than resell it. Apparently the question of public use under this decision depended upon whether the property taken is to be continued in public ownership rather than whether the use itself is a public one. In California our courts have followed the broader definition of ''public use'' and the cases hereinbefore cited have held that if property is taken for a public use, the fact that it is later to be returned to private ownership subject to restrictions protecting the public use, does not·make it any the less a public use. The later Pennsylvania cases have refused to follow the narrow interpretation in the Pennsylvania Mutual case, and in

addition, have supported the last mentioned statement. See *Belovsky* v. *Redevelopment Authority, supra,* 54 A.2d 277; *Schenck* v. *City of Pittsburgh, supra,* 70 A.2d 612. While it has been held that private property may not be taken for purely esthetic reasons (that rule is discussed in the Pennsylvania Mutual case, p. 906), it would seem proper in the light of the more modern cases, including the later Pennsylvania cases, to take private property if it were needed to protect a parkway and to provide light and air and usefulness for it. Section 14½, article I of the California Constitution (excess condemnation) provides this. Once it is determined that the taking is for a public purpose, the fact that private persons may receive benefit is not sufficient to take away from the enterprise the characteristics of a public purpose. (*Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437; see also *Chicago Land Clearance Com.* v. *White, supra,* 104 N.E.2d 236; *Herzinger* v. *Mayor & City Council of Baltimore* (Md.), 98 A.2d 87, 92; *Zurn* v. *City of Chicago, supra,* 59 N.E.2d 18; *Waddell* v. *Chicago Land Clearance Com.,* 206 F.2d 748.) "That purpose, as before pointed out, is not one requiring a continuing ownership of the property as it is in the case of the Housing Authorities Law in order to carry out the full purpose of that act, but is directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished the public purpose is completely realized. When, therefore, the need for public ownership has terminated, it is proper that the land be re-transferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. It is not the object of the statute to transfer property from one individual to another; such transfers, so far as they may actually occur, are purely incidental to the accomplishment of the real or fundamental purpose." (*Belovsky* v. *Redevelopment Authority, supra,* 54 A.2d 277.) (See also *Rowe* v. *Housing Authority, supra,* 249 S.W.2d 551.)

*McCord* v. *Housing Authority of City of Dallas,* (Tex. Civ. App.) 234 S.W.2d 108, is not in point here. It decided that the Housing Authority Law under which the Housing Authority purported to act contained no provision for selling or leasing the redeveloped land after slum clearance to private persons. For that reason it confined the definition of "public purposes" as used in the law to the continued ownership of the property after development by the authority. It contrasted the law with a federal law which expressly provided

for making slum cleared land available for development by private enterprise.

## EQUAL PROTECTION

██ The claim that the Redevelopment Acts because they provide for acquisition of property by eminent domain and its later resale, violate the Fourteenth Amendment to the Constitution in denying to the property owners the equal protection of the law, has been denied in several cases, among others, *Ajootian* v. *Providence Redevelopment Agency, supra,* 91 A.2d 21; *Nashville Housing Authority* v. *City of Nashville, supra,* 237 S.W.2d 946; *Belovsky* v. *Redevelopment Authority, supra,* 54 A.2d 277; *Robinette.* v. *Chicago Land Clearance Com.* (U.S. Dist. Ct., Ill., 1951); *State ex rel. Bruestle* v. *Rich, supra,* 110 N.E.2d 778. While the decision in the Robinette case is merely a "Memorandum and Order," the order dismissing the action for want of a substantial federal question, and is unpublished, it is of value for the reason that in *Robinette* v. *Campbell,* 342 U.S. 940 [72 S.Ct. 563, 96 L.Ed. 699], the Supreme Court denied motions for leave to file petitions for a writ of mandamus to compel the trial judge to expunge his order of dismissal. As said in *Waddell* v. *Chicago Land Clearance Com., supra,* 206 F.2d 748, where the same federal questions were raised (p. 750): "Thus it is seen that the Supreme Court has refused to entertain an application to review the questions which appellants have attempted to present by this action."

As pointed out in those cases, the acquiring of the property is for a public use, its sale and the transfer of the property from one individual to another, so far as they may occur, are merely incidental to that use, and not the main object of the statute. The taking from the owner is not arbitrary. It is for a public purpose. The owner is guaranteed and will receive full compensation. In *State ex rel. Bruestle* v. *Rich, supra,* 110 N.E.2d 778, in discussing the contention made concerning the proposed redevelopment project, similar to the contention made here, that the plan contemplated taking the property of one person and reselling it to another and was therefore unconstitutional, the court stated that the primary purpose of the plan was to eliminate the blight conditions and provide against their recurrence. It then stated (p. 785): "The exercise of the right of eminent domain under such a project, carried out pursuant to state law, has likewise been held by the Supreme Court of the United States as not to be contrary to the Fourteenth Amend-

ment to the federal Constitution. *Burt* v. *City of Pittsburgh,* 340 U.S. 802, 71 S.Ct. 53, 95 L.Ed. 589." See also *Waddell* v. *Chicago Land Clearance Com., supra,* 206 F.2d 748.

## DUE PROCESS

 The act does not violate the due process clause of the Fourteenth Amendment to the federal Constitution. (See *Robinette* v. *Chicago Land Clearance Com., supra.* (U.S. Dist. Ct., Ill., 1951); *People* v. *City of Chicago, supra,* 111 N.E. 2d 626, 636.) To violate the due process clause a state statute permitting state action in economic affairs must be arbitrary and without reason. (*Olsen* v. *Nebraska,* 313 U.S. 236 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500]; *United States* v. *Carolene Products Co.,* 304 U.S. 144 [58 S.Ct. 778, 82 L.Ed. 1234].) The courts are restricted to an inquiry as to whether any state of facts known or which reasonably could be assumed support the legislative judgment in enacting the statute. (*United States* v. *Carolene Products Co., supra,* 304 U.S. 144, 154.) While the legislative findings are not binding on the court, they are entitled to great respect. (*Block* v. *Hirsh,* 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865]; *Weaver* v. *Palmer Bros. Co.,* 270 U.S. 402 [46 S.Ct. 320, 70 L.Ed. 654].) Not only the California Legislature but the Congress of the United State and the legislatures of many states have made legislative findings of the necessity of redeveloping blighted areas by the use of private as well as public means. That modern conditions require such action is shown in the many books, articles and reports on community planning produced in the last few years. The courts, too, are entitled to take judicial notice of the need for, and the change in attitude towards, such planning. (See article by Hon. Emmet H. Wilson, *Consideration of Facts in Constitutional Cases,* vol. 17, So.Cal.L.Rev. 335.) As article I, section 13 of the California Constitution is identical in scope and purpose with the Fourteenth Amendment of the federal Constitution, what has been said here concerning due process under the latter applies to it under the California Constitution.

## DOES THE ACT UNLAWFULLY DELEGATE LEGISLATIVE POWER TO THE AGENCY?

 Interveners contend that as the agency is delegated the power to determine whether a given area is blighted, such delegation is contrary to article III, section 1 of the Constitution, which provides for the separation of powers into the three branches of government. It is contended that

the characterization of blighted areas in the act is so broad as to provide no standards by which the agency may be guided, and hence it has the absolute power to determine what facts constitute any of the elements constituting blight. This same contention in almost identically the same language was made concerning the ''Urban Redevelopment Law'' of Pennsylvania in *Belovsky* v. *Redevelopment Authority, supra,* 54 A.2d 277. The answer given by the court there applies equally here (p. 283): ''One of these assaults is directed against an alleged delegation of legislative powers contrary to the provision of Article II, section I of the Constitution, P.S., it being claimed that insufficient standards are set up in the statute to guide the Authority in exercising the powers with which it is vested. The fact is, however, that the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation. . . . All that the legislature could do, therefore, was to prescribe general rules and reasonably definite standards, leaving to the local authorities the preparation of the plans and specifications best adapted to accomplish in each instance the desired result, a function which obviously can be performed only by administrative bodies. While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act.'' See also *Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437, 462; *People* v. *City of Chicago, supra,* 111 N.E.2d 626. *Blatz Brewing Co.* v. *Collins,* 69 Cal.App.2d 639 [160 P.2d 37], is not opposed to our views here. That case held that ''the Legislature may not delegate authority to a board or commission to adopt rules which abridge, enlarge, extend or modify the statute creating the right.'' (P. 645.) That principle is not involved here.

SPECIAL PRIVILEGES

 Respondent contends that the act violates section 21, article I of the Constitution, which prohibits the granting of special privileges, in that the act provides that sale of the

redeveloped property may be made on the basis of its "fair value" arrived at as provided in the act, and as there is no minimum price set, the "fair value" may be less than the actual cost to the Agency. Therefore, says respondent, the purchaser might profit on the transaction, giving him a special privilege over the rest of the public. The same contention was made in *Housing Authority* v. *Dockweiler, supra,* 14 Cal. 2d 437, 460, concerning the fact that the houses to be erected were only to be rented to a certain class of citizens, and identically the same contention was made in *Opinion to the Governor, supra,* 69 A.2d 531, 534; *In re Slum Clearance in City of Detroit, supra,* 50 N.W.2d 340, 343; and in *Belovsky* v. *Redevelopment Authority, supra,* 54 A.2d 277. In all of them it was held that the fact that following the elimination of blighted conditions some incidental advantage might inure to private interests did not cause the taking to lose its public character nor make the statute unconstitutional.

### PROHIBITION OF GIFTS OF PUBLIC MONEYS

 Respondent contends that the furnishing of local grants-in-aid by the city provided for in the contracts sought to be executed here and the other public financial assistance to the agency proposed, constituted either the giving or lending of public moneys to private persons in violation of section 31, article IV of the Constitution. Actually there is no such gift or lending of money to private persons. The grants-in-aid are primarily for the providing of street improvements, fire protection, traffic control, schools, playgrounds, and other public services. The same objection was made to the Housing Cooperation Law in *Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d 437, 458, and in *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124, 146 [208 P. 284, 22 A.L.R. 1515], to the statute authorizing a bond issue to acquire lands, improve and sell them to veterans. In both cases it was held that the funds were being used by a public body for a public purpose, and were not given or loaned to private persons. In *Patrick* v. *Riley,* 209 Cal. 350, the court stated (p. 357 [287 P. 455]) : "As indicated in the case of *City of Oakland* v. *Garrison, supra* [194 Cal. 298 (228 P. 433)], at page 302, the fundamental test of the constitutionality of a statute requiring the use of public funds is whether the statute is designed to promote the public interests, as opposed to the furtherance of the advantage of individuals; and such a statute should not be declared unconstitutional because of the fact that, incidental to the main

purpose, there results an advantage to individuals." · (See also *People* v. *City of Chicago, supra*, 111 N.E.2d 626.)

EFFECT OF SECTION 19, ARTICLE XIII, CONSTITUTION

In 1952 this section was added to the Constitution by adoption by the people of an assembly constitutional amendment. In part it provides: "All of the provisions of the Community Redevelopment Law, as amended in 1951, which relate to the use or pledge of taxes or portions thereof as herein provided, or which, if effective, would carry out the provisions of this section or any part thereof, are hereby approved, legalized, ratified and validated and made fully and completely effective and operative upon the effective date of this amendment." In the analysis of this amendment by the Legislative Counsel sent to the voters appears the following: "In addition, the measure would validate all provisions of the Community Redevelopment Law consistent with the foregoing relating to the use or pledge of taxes." In the arguments in favor of the amendment appears the following: "This Constitutional Amendment provides a method of financing community redevelopment projects by relieving general taxpayers. Community redevelopment must be distinguished from public housing. The purpose is to eliminate blighted areas. Under the law, redevelopment, including the construction of streets, curbs, sidewalks and buildings, must be financed by private capital. However, a city or county must first acquire the property, if necessary by condemnation, because an individual, syndicate or corporation does not have the right of eminent domain and one property owner might refuse to sell and block the development.

"The difference between the expense of acquisition and clearing off the old, dilapidated buildings may be greater than the amount that may be received in the sale of the property for redevelopment in accordance with an officially approved plan. . . .

"If adopted, this constitutional amendment will readily facilitate the redevelopment of blighted areas in cities and counties as now authorized by the Community Redevelopment Act of the State of California. Blighted areas are an economic and social drag upon the community and it is good public business to eliminate them."

"While an amendment to a state constitution ratifying and confirming an act of its legislature is ineffectual to validate that act if it impair the obligations of a contract or divest

vested rights, still such an amendment may otherwise cure the infirmities of an act, and to that extent the act is thenceforth to be regarded as constitutional." (*Lee* v. *Superior Court,* 191 Cal. 46, 53 [214 P. 972].)

██ In view of the analysis sent to the voters, "If adopted, this constitutional amendment will readily facilitate the redevelopment of *blighted areas*" and the statement in the amendment that "*All* of the provisions of the Community Redevelopment Law, as amended in 1951 [the act with which we are dealing] . . . are hereby approved, legalized, ratified" etc., it is obvious that the people were not restricting their ratification to such portions of the act as dealt with blight caused by slum conditions and refusing ratification to blight caused by the other conditions enumerated in the act. (Emphasis added.)

EXCESS CONDEMNATION

Section 14½, article I, California Constitution.

This section, adopted in 1928, provides that in acquiring lands by gift, purchase or condemnation for memorial grounds, streets, squares or parkways, the state or any of its cities or counties may acquire additional lands within, in certain cases 150 feet, and in other cases within 200 feet, of the proposed improvement, and after the improvement is completed may sell the excess land not necessary for such improvement, with reservations concerning the use of such land so as to protect the improvement and to preserve its view, appearance, light, air and usefulness. The title to Senate Constitutional Amendment No. 16 (Stats. 1927, p. 2371), the means whereby section 14½ was placed on the ballot, states that it is a resolution to propose to the people as addition to the Constitution a section "relating to the taking of parcels of land by eminent domain where such border upon public improvements." An examination of the argument to the voters concerning the proposed section (see part I, page 17 of Arguments to Voters for the election of November 6, 1928) clearly shows that the section was intended primarily to apply to "little fractions of lots in the form of slivers or small triangles" left after making the particular improvements mentioned in the section, and in no manner was intended to apply either as an inhibition or otherwise to the projects contemplated in the act. ██ Obviously there is no conflict between this section and the act. This section is limited to memorial grounds, streets, squares and parkways. Were there any such conflict the adoption in 1952

of section 19, article XIII, expressly recognizing the Community Redevelopment Law, would end the conflict. It is interesting to note that in *State ex rel. Bruestle* v. *Rich, supra,* 110 N.E.2d 778, it was held "even if purchase or condemnation of the fee of the real estate in the slum area does involve acquisition of a greater interest in such real estate than actually necessary to accomplish the purpose of eliminating slum conditions and providing against their recurrence" (p. 787) such acquisition was specifically authorized by section 10 of article XVIII of the Ohio Constitution, which provided for excess condemnation generally, rather than limiting it, as does our Constitution, to specified purposes.

### WESTERN ADDITION FINANCES

As to Western Addition, interveners contend that the proposed plan violates section 33741. That section requires that no plan shall be approved unless it contains adequate safeguards that the work will be carried out pursuant to the plan, and it is contended that the plan will cost far more than the estimates shown, that petitioners are not acting in good faith as they are concealing the true costs, and that the moneys to be received from the federal government are not adequate to complete the plan. ■ Primarily the adequacy of the finances and the safeguards for completing the plan are for the determination of the administrative bodies. If they are not acting in good faith, interveners can bring an appropriate proceeding to determine that question in the trial court.

### CLEAN HANDS

■ Interveners contend petitioners are not entitled to equitable relief as they do not come into court with clean hands. This is based upon the contention that the contract which petitioners seek to have executed contains inaccurate data which should be corrected and brought up to date before execution, and that petitioners have prevented development of the area. As we have heretofore shown, this is not the proper forum in which to raise such question, interveners having no right to broaden the scope of the proceeding. (*Wright* v. *Jordan, supra,* 192 Cal. 702, 704, 714.) ■ Whether the agreement is an improvident and unwise one for the Agency to make is for the Agency and the city to determine. As said in *In re City & County of San Francisco,* 191 Cal. 172, 185 [215 P. 549], "In forming its judgment it must be presumed that the City considered the wisdom and policy

of the whole plan in the light of the objects to be attained. The answer to adverse criticism is that the judgment of the City is conclusive in the absence of a showing of want of jurisdiction on the part of the City or a showing of bad faith on the part of its officers or gross extravagance or the existence of some fact sufficient to vitiate the contract.'' (See also *City & County of San Francisco* v. *Boyd*, 22 Cal.2d 685, 690 [140 P.2d 666].) '' '. . . it is not for the courts to pass upon the merits of suggestions as to how the contract might be strengthened by amendments the desirability and effectiveness of which are for the consideration solely of the agencies and governing body to which the Urban Redevelopment Law has committed that responsibility.' '' (*Oliver* v. *City of Clairton* (June, 1953), 374 Pa. 333 [98 A.2d 47, 51].)

▇▇▇ We fail to see how the failure of the city to develop its portion of the Diamond Heights Area in the past estops or prevents it from redeveloping the entire area.

It should be emphasized that it is the combination in Diamond Heights of practically all the blight conditions mentioned in section 33042, subdivisions (a) to (d), showing a definitely compelling economic need, which permits the use of the act. ▇▇▇ Public agencies and courts both should be chary of the use of the act unless, as here, there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan. As said in *Schneider* v. *District of Columbia, supra,* 117 F.Supp. 705 ''. . . it behooves the courts to be alert lest currently attractive projects impinge upon fundamental rights.''

As we have herein stated, our decision is limited to questions of law, based upon the assumption that the findings of the administrative agencies involved in the redevelopment program are true. This decision in nowise bars a determination in a trial court of such issues of fact as may be properly raised in an attack upon an administrative proceeding.

The demurrers of respondent and interveners to the petition and of petitioners to the complaint in intervention are overruled. The motion of petitioners to strike all portions of the complaint in intervention other than those which constitute a demurrer to the petition is granted. It is ordered that a per-

emptory writ of mandate issue commanding respondent to execute the contracts referred to in the petition.

Peters, P. J., and Wood (Fred B.), J., concurred.

Petitions for a rehearing were denied February 25, 1954, and respondents' and interveners' petitions for a hearing by the Supreme Court were denied March 25, 1954. Edmonds, J., Carter, J., and Schauer, J., were of the opinion that the petitions should be granted.