ANNBAR ASSOCIATES, a Copartnership, Continental Building & Operating Co., Inc., a Corporation, and Irene Tomlinson, Appellants,

v.

WEST SIDE REDEVELOPMENT CORPORATION, a Corporation, City of Kansas City, Missouri, a Municipal Corporation, and Norman H. Anderson, Attorney General, State of Missouri, Respondents.

No. 51108.

Supreme Court of Missouri, En Banc.

Dec. 13, 1965.

Rehearing Denied Jan. 10, 1966.

Sheffrey, Ryder & Skeer, David Skeer, Judith Whittaker, Kansas City, for appellants Annbar Associates and Continental Building & Operating Co., Inc.

Downey, Sullivan & McCormick, by Leo L. McCormick, Kansas City, for appellant, Irene Tomlinson.

Kenneth M. Myers, Wm. Coleman Branton, James E. Grier, Kansas City, Brewer, Myers & Branton, Kansas City, of counsel, for respondent West Side Redevelopment Corporation.

Norman H. Anderson, Atty. Gen., J. Gordon Siddens, Asst. Atty. Gen., Jefferson City, for respondent, Anderson.

Herbert C. Hoffman, City Counselor, Guy W. Rice, Kansas City, for respondent, Kansas City, Mo.

HENLEY, Judge.

This is an action in which plaintiffs-appellants seek: (1) a declaratory judgment that certain statutes of the State and ordinances of the City of Kansas City,

Missouri, are unconstitutional; and, (2) an injunction to prevent defendants-respondents, West Side Redevelopment Corporation and the City of Kansas City from proceeding with a redevelopment project described in one of the ordinances attacked. Judgment was for defendants and plaintiffs appeal.

Two of the plaintiffs-appellants are Annbar Associates and Continental Building & Operating Company, Inc., a corporation. Annbar Associates is a copartnership comprised of Ann Lubin Goldstein and Barbara Lubin Goldsmith, owners of the Muehlebach Hotel and Towers in Kansas City, and shall hereinafter be referred to as Annbar. Continental Building & Operating Company, Inc., is the lessee and operator of the Continental Hotel in Kansas City, and shall hereinafter be referred to as Continental. Neither owns property in the area sought to be redeveloped. Both pay ad valorem real estate taxes to the city.

The third plaintiff-appellant is Irene Tomlinson, hereinafter referred to as Tomlinson, who was permitted by the trial court to intervene as a party plaintiff over the objection of Annbar and Continental. Tomlinson is the owner of real property located within the area sought to be redeveloped.

The defendant-respondent, West Side Redevelopment Corporation, is an urban redevelopment corporation organized and existing under and by virtue of Chapter 353,[1] and shall hereinafter be referred to as West Side. The other defendants-respondents are the City of Kansas City, Missouri, a constitutional charter city, hereinafter referred to as the City, and Norman H. Anderson, as Attorney General of the State.

By authority of the ordinances now under attack, the City and West Side on December 16, 1963, entered into a contract (hereinafter referred to as Supplemental Contract) providing for the clearance and re-

development of a blighted area (hereinafter referred to as Redevelopment Area) located between the east line of Pennsylvania Avenue and the west line of Washington Street from the south line of Seventh Street to the north line of Tenth Street and a smaller tract at the southeast corner of the intersection of 9th and Washington Streets fronting approximately 300 feet on Washington and 265 feet on 9th; all containing approximately 7.88 acres, and being commonly referred to as the Quality Hill area. The Supplemental Contract contemplates the erection of a Hilton Hotel complex and convention facility in the Redevelopment Area within such proximity to the hotel properties of Annbar and Continental as to be competitive with their businesses.

Appellants pray that the court declare: (1) that Chapter 353 RSMo 1959 (hereinafter referred to as Redevelopment Law), and more particularly §§ 353.110(2) and 353.150, subd. 4 thereof, and Chapter 61 of the Revised Ordinances of Kansas City (hereinafter referred to as Redevelopment Ordinance), and more particularly §§ 61.230 (c) and 61.240(d) thereof[2] are contrary to the Constitution of Missouri and in violation of the Constitution of the United States; (2) that Committee Substitute for Ordinance Number 29352 (hereinafter referred to as Sub. Ord. 29352) passed by the city council on November 15, 1963, is (a) contrary to the statutes and Constitution of Missouri and in violation of the Constitution of the United States, and, (b) contrary to the public policy of the state; and (3) that all are, therefore, null and void. As indicated, appellants also pray that West Side and City be enjoined from proceeding with the redevelopment project.

The case was submitted on the pleadings, a stipulation of facts to which was attached 27 exhibits, brief oral testimony, and exhibits consisting of depositions and docu-

---

1. All references to statutes are to RSMo 1959 and V.A.M.S.

2. All references to ordinances are to the Revised Ordinances of Kansas City, Missouri.

mentary evidence. Upon submission, the court took the case under advisement and thereafter made findings of fact and conclusions of law, and entered its judgment. The stipulation contains the facts pertinent to the disposition of the main or basic issues in the case, many of the facts being incidentally related in the above introduction to the case. Other facts will be related as necessary in the course of this opinion. We have read or examined, and considered, all the evidence and exhibits which, according to a remark in the transcript, weigh in excess of 25 pounds.

■ It is common knowledge that one of the results of the nineteenth century beginning of the transformation of our country from a predominantly agricultural to a predominantly industrial society has been the growth like "Topsy" of our great cities. Within the last thirty years we have awakened to the realization that a result of that growth has been the creation of slums and blighted areas therein constituting a serious and growing menace injurious to the public health, safety, morals and welfare of their inhabitants as well as a depreciation in value of properties within and adjacent to those areas, and a consequent progressive diminution of tax revenues. Prompted by the need to eliminate these conditions as a breeding ground for juvenile delinquency, infant mortality, crime and disease, most, if not all, states have vested their municipalities with power to eradicate those conditions and redevelop those areas. The federal government with its vast, but not unlimited, resources, and the cities with their limited resources, have literally poured money into urban renewal since the end of World War II. Under Title I of the Federal Housing Act of 1949 (Public Law 171, 81st Congress, 42 U.S.C.A. § 1451 et seq.) the federal government has provided financial assistance to state and city governments in the form of loans and grants for the redevelopment of slums and blighted areas. The people of the two great metropolitan areas of this state, Kansas City and St. Louis, have authorized their respective cities to increase their bonded indebtedness and spend the proceeds of those bonds and other city revenues for the clearance and redevelopment of their blighted areas.

■ It is common knowledge that it would be impossible to clear and redevelop these areas without the power of eminent domain. In this state urban renewal and redevelopment is being accomplished, for the most part, through a program of cooperation between government and private enterprise, the government furnishing its power of eminent domain and private enterprise performing the actual redevelopment. The public policy of this state has been declared in the Land Clearance for Redevelopment Law (Chapter 99, RSMo 1959) to be: "A municipality, to the greatest extent it determines to be feasible in carrying out the provisions of this law, shall afford maximum opportunity, consistent with the sound needs of the municipality as a whole, to the rehabilitation or redevelopment or renewal of [blighted, etc.] areas *by private enterprise.*" (Emphasis ours.) See § 99.310. The two most common means provided nationwide for the initiation of redevelopment projects by private enterprise are: first, by an authority or commission such as our "Land Clearance for Redevelopment Authority" of the several communities, having municipal powers and attributes, which acquires by condemnation and purchase the lands of an area for which it has developed a redevelopment plan, and then sells or leases the land to private enterprise for redevelopment; and, second, by private redevelopment companies as corporations organized under our "The Urban Redevelopment Corporations Law" which companies themselves (such as West Side) initiate plans for redevelopment and acquire lands in an area to be redeveloped by condemnation and purchase subject to prior approval by and authority from a legislative or administrative agency empowered to approve and grant such authority. An urban redevelopment corporation may, as a redeveloper, also acquire land by purchase or lease

from a Land Clearance for Redevelopment Authority. § 353.060.

Such constitutional authority as is needed for full and complete elimination of this cancerous attack upon our municipalities was provided by the 1945 Constitution of Missouri, V.A.M.S. Article VI, § 21, thereof provides: "Laws may be enacted [by the General Assembly], *and any city * * * operating under a constitutional charter may enact ordinances,* providing for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas, and for recreational and other facilities incidental or appurtenant thereto, and for taking or permitting the taking, by eminent domain, of property for such purposes, and when so taken the fee simple title to the property shall vest in the owner, who may sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest." (Emphasis supplied.) As an incentive or inducement to encourage elimination of blighted areas by private enterprise, Article X, § 7, provides: "For the purpose of encouraging * * * the reconstruction, redevelopment and rehabilitation of obsolete, decadent or blighted areas, the general assembly by general law, may provide for such partial relief from taxation of the lands devoted to any such purpose, and of the improvements thereon, by such method or methods, for such period or periods of time, not exceeding twenty-five years in any instance, and upon such terms, conditions, and restrictions as it may prescribe." It was pursuant to the authority of Article VI, § 21, that the General Assembly enacted the "Land Clearance for Redevelopment Authority Law" (§§ 99.300 to 99.660) and pursuant to that section and Article X, § 7, that the General Assembly enacted "The Urban Redevelopment Corporations Law" (Chapter 353) applying to all constitutional charter cities having or thereafter containing a population of 350,000 inhabitants or more. Section 353.110 provides for partial relief from taxation of the real property of such corporations, viz: for

the first 10 years it is subject to assessment for general ad valorem taxes solely on the value of the land exclusive of improvements, for the next 15 years such taxes are measured by fifty per cent of the true value including improvements.

Section 353.030(11) restricts and limits the net earnings of an urban redevelopment corporation to 8% per annum of the cost to the corporation of the redevelopment project including the land, and further provides that net earnings from a redevelopment project shall in no event exceed 8% per annum upon the entire cost thereof.

It was also pursuant to the authority of Article VI, § 21, that Kansas City, as a constitutional charter city, adopted "The Urban Redevelopment Ordinance" (Chapter 61, R.O.K.C.). A summary of the provisions of the Redevelopment Ordinance will be helpful to an understanding of its purpose and scheme.

Section 61.240 of the ordinance, in providing for partial tax relief of the property of urban redevelopment corporations, is substantially the same as § 353.110. Sections 61.190 and 61.200 of the ordinance, in restricting and limiting the net earnings of such corporations, are substantially the same as § 353.030(11).

The city council declared and determined in § 61.020 that blighted areas exist within the city; that such areas are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime; that the existence of such conditions results in progressive deterioration and causes a wasteful expenditure of public funds for policing, etc.; that it is impossible and uneconomic for individual owners to independently undertake to remedy such conditions; *that such conditions require the employment of capital on an investment basis,* etc.; that the acquisition of such areas for clearance and redevelopment, and their clearance and redevelopment, under supervision with appropriate planning, are necessary for the public welfare, and are public

uses and purposes for which private property may be acquired by purchase or eminent domain; that the necessity for the provisions of the Redevelopment Ordinance is, therefore, declared as a matter of legislative determination to be in the public interest.

Section 61.050 provides for the filing of an application for approval of a redevelopment plan by a redevelopment corporation with the city clerk. This section also provides that the plan shall not be acted upon by the council until after a public hearing thereon has been held by the city plan commission and a report thereon by the commission to the council. Section 61.070 provides in detail what a redevelopment plan shall contain. Section 61.060 provides for publication of a notice of hearing, a hearing before the city plan commission at which interested parties may be heard, such other investigation as the commission deems necessary, and a report thereafter to the council. Section 61.080 provides for approval of the plan by the commission only upon determination by it that, inter alia, the area is blighted and redevelopment in accordance with the plan is necessary to effectuate the public purposes declared in § 61.020. Section 61.140 provides that the commission shall file its report on the development plan with the city clerk accompanied by an ordinance providing for approval or disapproval of the plan; that the ordinance and the plan shall be referred by the council to a committee for another public hearing thereon. After a hearing, this committee shall file its report with the council and the council may then approve or disapprove the plan. Section 61.150 provides that in any ordinance approving a redevelopment plan the council shall find and declare: (1) that the area proposed to be redeveloped is blighted and that clearance or redevelopment thereof is necessary for the public convenience and necessity; (2) if the redevelopment corporation seeks to acquire property in the blighted area by condemnation, that acquisition by such means is for the public convenience and

necessity; and, (3) that approval of the plan and construction of the redevelopment project are necessary for preservation of the health, safety, morals and welfare, etc., of the public. Section 61.140 provides also that if the council adopts an ordinance approving the plan it may authorize the city director of finance to enter into a contract with the redevelopment corporation, such contract to contain the provisions of the plan, the approving ordinance, and a provision that the conditions, provisions and restrictions of the Redevelopment Ordinance be incorporated therein by reference. Section 61.160 provides that the redevelopment corporation may acquire property within the blighted area by eminent domain, "Provided, that such real property shall be devoted to the purposes and used subject to the conditions described in the development plan." Section 61.110 makes it the duty of the city plan commission to investigate and determine from time to time, and make reports to the council at least every six months, whether the redevelopment corporation is complying with the plan and the provisions of the redevelopment ordinance. This section also provides that after completion of the project the redevelopment corporation shall make annual financial reports to the council, through the director of finance, disclosing its earnings, etc. Section 61.250 provides that whenever any redevelopment corporation shall fail substantially to comply with the development plan or the redevelopment ordinance such fact may be certified to the city counselor who is authorized to bring such suit as is necessary to enforce the provisions of the redevelopment plan or to bring an action for damages for any breach thereof.

On August 28, 1963, West Side filed with the city clerk an application for approval of its plan for redevelopment of the so-called Quality Hill area. It is agreed between the parties, and the court found, that this area is a blighted area within the meaning of the Redevelopment Law and Redevelopment Ordinance. This redevelop-

ment plan was the result of consolidation of three separate plans theretofore submitted by three urban redevelopment corporations, the other corporations having been merged into West Side as the survivor. The plan contemplates, as stated above, the construction of a hotel complex and convention facility after removal of existing buildings from the area. The whole project, to be constructed in three stages, includes a 16-story hotel building, an 8-story hotel building and six 2-story motor-hotel buildings, all providing 812 guest rooms, a 2-story convention center building, a restaurant, and multi-level and surface parking space for 748 automobiles. It is estimated that the total cost of the project will exceed $16,000,000. The first stage construction, which would provide 312 guest rooms, the convention center building, restaurant and parking space for automobiles, is estimated to cost $8,270,000. Of this amount, $2,000,000 is the estimated cost of the land. West Side will acquire the land by purchase, if possible; otherwise, by condemnation. West Side proposes to finance the first stage by a first mortgage loan of $4,270,000, the balance to be provided 50% by Hilton Hotels Corporation (hereinafter sometimes referred to as Hilton) and 50% by Lewis E. Kitchen, Allen J. Block and others (hereinafter sometimes referred to as Kitchen and Associates). The redevelopment plan, as embodied in Sub. Ord. 29352, provides that after acquiring the land West Side will lease it to Hilton and Kitchen and Associates as lessee at a specified rental for a term of not less than 25 nor more than 99 years; that the lessee shall construct and pay for the improvements in accordance with the redevelopment plan and when affixed to the land ownership thereof will vest in West Side; that lessee may enter into a management contract with Hilton for operation of the completed project at a fee not to exceed normal fees usually charged for such services; that the 8% earnings restriction shall apply to both West Side and lessee, any net earnings in excess thereof to be paid to the city. This plan also provides that West Side will, for the

first 10 years, pay city, county and state taxes equal to that now being realized by these authorities. It is estimated that for the 25-year partial tax abatement period the taxes paid by the redeveloper on the first stage construction alone will exceed present tax revenues by over $1,000,000 and if all three stages are constructed the tax revenue after the 25th year will be more than 50 times the present return.

On September 9 and 23, 1963, after publication of notices thereof, public hearings on West Side's application were held by the city plan commission. Counsel for Annbar and Continental attended the hearing on September 9 and urged defeat of the plan upon essentially the same grounds as those advanced in the trial court and in their briefs here. A transcript of the proceedings before the commission and its report thereon, and copies of the redevelopment plan and the proposed ordinance, are attached to the stipulation of facts as exhibits. On September 23, the application was approved by the commission and a report filed with the council. On October 25, Ordinance 29352 (not Sub. Ord. 29352) was introduced on first reading before the council and referred to the finance committee. On October 31, the finance committee held a public hearing on Ordinance 29352 and on November 8 filed its report recommending that the council adopt a substitute for Ordinance 29352. A copy of the transcript of this hearing and the committee's report and recommendations are attached to the stipulation of facts as exhibits. Counsel for Annbar and Continental attended this meeting also and urged defeat of the plan and ordinance for essentially the same reasons given in their appearance before the city plan commission. On recommendation of the committee, provisions were added to the ordinance requiring: (1) that the 8% earnings limitation be applicable to both West Side and its lessee, and, (2) that West Side, its successors and assigns, complete the clearance of blight from the area and construction of the improvements included in the first stage of the project, notwith-

standing the possibility of termination of tax relief. On November 15th, the city council adopted Sub. Ord. 29352 by unanimous vote of those present, one councilman being absent. The ordinance contained the above provisions. In this ordinance the council made the necessary findings and determinations required by the several sections of the Redevelopment Ordinance, and directed the Mayor to deliver to West Side a certificate of convenience and necessity authorizing it to use the power of eminent domain to acquire that portion of the property it could not purchase by negotiation. On December 16, the City and West Side entered into the Supplemental Contract authorized by Sub. Ord. 29352. Prior to the execution of this contract, counsel for Annbar and Continental notified the City, West Side, and other interested persons, of its intent to file this suit and sent them copies of the petition it later filed on November 26.

■ We note that there was testimony which supports a finding, and the trial court found, that West Side has incurred and paid $33,000 in architectural expense in connection with the design of the project, and if it is enjoined or prevented from proceeding with the project it will suffer a loss in excess of $25,000. This testimony was presented by West Side for the announced purpose of showing that the amount in dispute exceeds $15,000, "so that in the event of an appeal the Supreme Court of Missouri will have exclusive appellate jurisdiction." The court has jurisdiction by reason of the constitutional questions involved.

Appellant, Tomlinson, raises two points in her brief. The first is that the Redevelopment Law and the Redevelopment Ordinance permit the taking of private property by a private corporation for private use without the consent of the owner. She says that the taking permitted by this law and ordinance violates §§ 2, 10 and 28 of Article I of the Constitution of Missouri and the Fifth and Fourteenth

Amendments to the Constitution of the United States.

West Side is without doubt a private corporation, one of its purposes being profit. It is also "organized to serve a public purpose." § 353.030(11). It is authorized by the statutes and ordinances, attacked here, to exercise the power of eminent domain to acquire private property in the area declared to be blighted. After acquisition, the property will be owned and operated by private interests. So it may be said that the "use" to which the property may be put will be private, if the words "private use" are considered in a narrow sense.

In State on Inf. of Dalton, Attorney General v. Land Clearance for Redevelopment Authority of Kansas City, Mo. et al., 364 Mo. 974, 270 S.W.2d 44, the relator challenged the constitutionality of the Land Clearance for Redevelopment Authority Law (§§ 99.300 to 99.660) contending that that law authorized the taking of private property for private use in violation of Article I, §§ 26 and 28 of the Constitution of Missouri and the Fourteenth Amendment to the Constitution of the United States. In that case the Land Clearance Authority, a public body corporate (§ 99.320(1)), was empowered to acquire property in a blighted area by eminent domain, clear it of the blight, and then sell it to private interests for redevelopment. Relator's position was that this constituted a direct flouting of the principle that private property shall not be taken for private use without the consent of the owner. At the expense of lengthening an opinion we realize is already growing too long we quote at length from the above case because what is said therein on this question clearly explains and supports the reasons for the result we now reach on this point and lays the foundation for determination of questions raised by Annbar and Continental. In holding that the acquisition of property by Authority by eminent domain and its subsequent sale thereof to a private redeveloper constituted a public use as distinguished from a private

use, this court, en banc (270 S.W.2d 1. c. 49 to 52) said: "Article I, § 26, of the Constitution, forbids the taking of private property for public use without just compensation. Article I, § 28, provides: 'That private property shall not be taken for private use with or without compensation, unless by consent of the owner, [exceptions not here material]; and that when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public.' It is also a violation of the Fourteenth Amendment of the Federal Constitution for a state to take private property for a private use. Missouri Pacific Railway Co. v. [State of] Nebraska, 164 U.S. 403, 17 S.Ct. 130, 41 L.Ed. 489.

"Within recent years the appellate courts of some fifteen of our sister states and the District of Columbia have upheld one phase or another of slum clearance and redevelopment laws. The appellate courts of two states have held them unconstitutional. Those upholding such laws do so on the ground that blighted and insanitary areas in the state constitute a menace to public health, safety, morals and general welfare, and that the acquisition and redevelopment of such areas constitute the taking of private property for public use. The constitutions of all states forbid generally the taking of private property for private use without the consent of the owner. The two states denying the constitutionality of such acts, Georgia and Florida, do not deny that the existence of blighted or insanitary areas is a menace to the general welfare, but they disapprove of the constitutionality of the laws enacted in their states on the ground that the redevelopment of such areas as contemplated by the acts under consideration constitutes a private as distinguished from public use.

"The provisions of Article I, §§ 26 and 28, were carried forward from our Constitution of 1875 into our new Constitution of 1945, in which latter document is incorporated a new section which must be read and construed in connection with the aforesaid provisions. No similar provision is found in the constitution of either of the states that have disapproved slum clearance laws. The new provision is Article VI, § 21, as follows: * * * [For brevity we omit quotation from Constitution; it can be found on page 640.]

"As early as 1923, in the case of In re Kansas City Ordinance No. 39946, (Kansas City v. Liebi), 298 Mo. 569, 252 S.W. 404, 407, 28 A.L.R. 295, this court stated: 'Two different theories are presented by the judicial attempts to describe the subjects to which the expression [public use] would apply. One theory of "public use" limits the application to "employment"—"occupation." A more liberal and more flexible meaning makes it synonymous with "public advantage"—"public benefit."' And at page 409 of 252 S.W., the opinion further states: 'An examination of cases in this state will show this court is inclined to a more liberal application of the term "public use."'

"In 1939, the State Municipal Housing Authorities Law, Sections 99.010–99.230, RSMo 1949, V.A.M.S., very kindred in its purpose and effect to the Act here under consideration, came before this court in the case of Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S.W.2d 65. It was there held that the Housing Authority, organized under the Act for the purpose of clearing slums and erecting and maintaining low-cost housing, was a municipal corporation with governmental functions for public purposes, and that the remedial purposes of the Act would be presumed to be 'public purposes' unless it clearly appeared they were not in harmony with the provisions of the Constitution; and further held that the concept of 'public use' was never to be taken as static, but should be applied and construed as made necessary to the public welfare by changing conditions. To the same effect are the cases of Bader Realty & Investment Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S.W.2d 489; St. Louis

Housing Authority v. City of St. Louis, 361 Mo. 1170, 239 S.W.2d 289.

"Relator contends that the Housing Law and housing cases are distinguishable from the Land Clearance for Redevelopment Law and the instant case, in that the areas authorized to be taken by eminent domain under the Housing Law and the cases decided thereunder are to be used by the Authority for the construction of modern, sanitary and low-cost housing; whereas, in the instant case the property proposed to be taken and cleared of its blighted and insanitary condition is ultimately to be sold to private interests. Relator's position is that this amounts to a direct flouting of the principle that private property cannot be taken for private use without the consent of the owner; and that even though Section 99.310 of the Law declares that the acquisition of real estate in blighted and insanitary areas for purposes of redevelopment, such as is contemplated by the plan here under consideration, is a public use, yet, under Article I, § 28, of the Constitution, V.A.M.S., the question whether a use is public can be determined only by the judiciary.

"Relator further says that Article VI, § 21, 'is silent as to whether the end-use of land so taken must be a public use', and that since 'Article I, § 28, sets forth specific exceptions, such as ways of necessity and sanitary ditches, and allows the taking of private property for private use in these exceptional situations, it can be fairly inferred that the framers of the Constitution inferred that all other exercise of the power of eminent domain be for a public use, and that Article VI, § 21, should not be read as an exception to Article I, § 28.' * * *

"The very fact that Article VI, § 21, is silent as to the use to which the land may be put after it is cleared of its blighted and insanitary condition and sold, *'subject to such restrictions as may be deemed in the public interest'* (emphasis ours), conveys, we think, the definite assumption that the primary object and public purpose of the law shall be the clearance and correction of any

duly declared blighted and insanitary condition, and that thereafter the area may be sold with or without restrictions to a private enterprise, as may be deemed by Authority to be in the public interest.

"A vexing question is whether Article VI, § 21, constitutes an exception to Article I, § 28, which declares that the question whether the contemplated use of property sought to be taken by the processes of eminent domain shall be judicially determined without regard to any legislative declaration that the use is public. On the other hand, Article VI, § 21, in express terms, unqualifiedly authorizes the legislature and cities and counties operating under constitutional charters to enact legislation providing for the taking of blighted and insanitary areas by eminent domain.

"In discussing an analogous situation, the Court of Appeals of New York, in the case of Kaskel v. Impellitteri, 306 N.Y. 73, 115 N.E.2d 659, 662, said: 'However, the situation here actually displayed is one of those as to which the Legislature has authorized the city officials, including elected officials, to make a determination, and so the making thereof is simply an act of government, that is, an exercise of governmental power, legislative in fundamental character, which, whether wise or unwise, cannot be overhauled by the courts. If there were to be a trial here and the courts below should decide in favor of plaintiff, there would be effected a transfer of power from the appropriate public officials to the courts. The question is simply not a justiciable one.' In the case of Schenck v. City of Pittsburgh, 364 Pa. 31, 70 A.2d 612, the Supreme Court of Pennsylvania held, as concisely stated in the syllabus: 'In absence of any indication that city planning commission did not act in good faith or was wholly arbitrary in certifying the area designated by it as blighted within meaning of Urban Redevelopment Law, its certification to that effect was not subject to judicial review.'

"In determining the question thus posed, we think we must, if possible, give effect to

both Article I, § 28, and Article VI, § 21. And we must take into consideration the Fourteenth Amendment to the Constitution of the United States. In the case of City of Cincinnati v. Vester, 281 U.S. 439, 446, 50 S.Ct. 360, 362, 74 L.Ed. 950, the court said that 'in considering the application of the Fourteenth Amendment [to the Constitution of the United States] to cases of expropriation of private property, the question what is a public use is a judicial one.' The opinion in that case further states, however, that: 'In deciding such a question, the Court has appropriate regard to the diversity of local conditions and considers with great respect legislative declarations and in particular the judgments of state courts as to the uses considered to be public in the light of local exigencies.'

"Prior to the adoption of our new Constitution, in which for the first time appeared the broad powers granted the legislative branch as set forth in Article VI, § 21, we had held in the Laret case, supra, that a finding and declaration as to the need of public housing would be entitled to great weight, and that the courts would presume the declared purposes 'public purposes' unless it clearly appeared they were not in harmony with the constitution. (It was held they were in harmony.) * * *

"We hold that Article I, § 28, and Article VI, § 21, considered together and in the light of the above cited cases, mean that final determination of the question whether the contemplated use of any property sought to be taken under the Law here in question is public rests upon the courts, but that a legislative finding under said law that a blighted or insanitary area exists and that the legislative agency proposes to take the property therein under the processes of eminent domain for the purpose of clearance and improvement and subsequent sale upon such terms and restrictions as it may deem in the public interest will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears upon allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith. * * * *"

The court also observed, 270 S.W.2d at l. c. 53, that the statutes attacked and the undertakings of Authority and Kansas City clearly demonstrated " * * * that the purpose in acquiring the land is to rid it of its blighted and insanitary condition and to thereafter convey it to redevelopers for conversion to useful purposes in accordance with the redevelopment plan"; that in the cases from other jurisdictions cited therein[3] "it is pointed out that the primary purpose of a redevelopment project is a public purpose, and that *any benefits to private individuals are merely incidental to the public purpose.*" (Emphasis supplied.) The court also observed in ruling another charge leveled at the constitutionality of the Land Clearance Authority Law, at l. c. 57, that the purpose of the provision in Article VI, § 21, permitting the sale of property acquired by Authority " * * * is that the taker shall become invested with the fee simple title in order to enable it to 'sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest' " and, " * * * if the Authority deems it in the public interest, such property may be sold without restriction."

It is interesting to note that in another case, in which the opinion was handed down during the same month by this court, en banc, one contention was that a section of

3. Rowe v. Housing Authority of City of Little Rock, 220 Ark. 698, 249 S.W.2d 551; Redevelopment Agency of City and County of San Francisco v. Hayes, 122 Cal.App.2d 777, 266 P.2d 105; Ajootian v. Providence Redevelopment Agency, 80 R.I. 73, 91 A.2d 21; Gohld Realty Co. v. City of Hartford, 141 Conn. 135, 104 A.2d 365; Foeller v. Housing Authority of Portland, 198 Or. 205, 256 P.2d 752. For other cases in other jurisdictions reaching the same result, see: Velishka v. City of Nashua, 99 N.H. 161, 106 A.2d 571, and cases summarized in 44 A.L.R.2d at pages 1421 to 1426.

the Urban Redevelopment Corporations Law (§ 353.110) was unconstitutional as granting a tax exemption to private interests because the land acquired by Authority would be sold to a private urban redevelopment corporation, such as West Side. Land Clearance for Redevelopment Authority of City of St. Louis v. City of St. Louis et al., Mo.Sup., 270 S.W.2d 58, 64 [9, 10, 11]. A taxpayer, an owner of property within the area to be acquired for redevelopment, was permitted to intervene as a party. A specific contention of intervenor was that Article X, § 7, authorized partial tax relief only when the purpose of urban redevelopment was a public one, and that the sale to and use by a private corporation was not a public purpose. The court held that the purpose was a public one and that the provisions of § 353.110 are expressly authorized by Article X, § 7, and do not conflict with Article X, § 6.

 Tomlinson contends that an important distinction between the Kansas City and St. Louis Land Clearance Authority cases and the instant case is that in those cases there was to be a taking of private property by a public body, the Land Clearance Authority; whereas, here the taking is to be by a private corporation. If authority exists to empower a public body to acquire private property by eminent domain and sell it to private enterprise for redevelopment, then such authority exists to empower a private corporation to acquire property by such means for a public purpose. Article VI, § 21, empowering legislative bodies to enact laws and ordinances to provide for the acquisition of private property by eminent domain for the purposes therein stated, does not designate the entities and, of course, makes no distinction between entities, such legislative bodies may invest with that power. Under the Land Clearance Authority Law private enterprise is only one step removed from ownership, the Authority being the condemnor. Under the Redevelopment Law and Redevelopment Ordinance that step is removed, and private enterprise takes the initial step as the con-

demnor. We cannot, and should not, second guess the legislative branch of government as to what bodies may be invested with the power of eminent domain. The granting of that power to private enterprise is not an inherent prohibition of the constitution. We see no difference between the power granted redevelopment corporations and that granted railroads and others to carry on a business necessary to serve the public. The words of the Supreme Court of the United States in ruling the constitutionality of the District of Columbia Redevelopment Act of 1945 are appropriate. That court said: "Once the object [clearance and redevelopment of slums or blighted areas] is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. \* \* \* Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. \* \* \* The public end may be as well or better served through an agency of private enterprise than through a department of government— or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." Berman et al. v. Parker et al., 348 U.S. 26, 1. c. 33, 34, 75 S.Ct. 98, 103, 99 L.Ed. 27. We cannot say that public bodies are the only entities that may be invested with the power of eminent domain—the authority to designate those entities with whom it may invest that power is solely that of the legislative branch.

For cases from other jurisdictions supporting the views above expressed, wherein

private redevelopment corporations sought to acquire property by eminent domain, see: Zurn v. City of Chicago, 389 Ill. 114, 59 N.E.2d 18; Zisook v. Maryland-Drexel Neighborhood Redevelopment Corporation, 3 Ill.2d 570, 121 N.E.2d 804; Amalgamated Housing Corporation v. Kelly, 193 Misc. 961, 82 N.Y.S.2d 577.

■ We hold that the Redevelopment Law and Redevelopment Ordinance do not violate the constitutional provisions cited by Tomlinson.

■ The second point in Tomlinson's brief is that the Redevelopment Law and Redevelopment Ordinance preclude participation in the redevelopment project by owners divested of property in the project area. The point is not clear. The point is not raised as an issue in her pleadings or in her motion for new trial. In her argument she says that it is inherently wrong to exclude "participation of present property owners in the project and vesting exclusive control in the redeveloper to the detriment of the rights of the public." We have held that a public use is synonymous with public benefit; this use could not be a detriment to rights of the public. In re Kansas City Ordinance No. 39946 (Kansas City v. Liebi), 298 Mo. 569, 252 S.W. 404, 407. We have read the dissenting opinions she refers to in Rabinoff v. District Court etc., 145 Colo. 225, 360 P.2d 114, but we agree only with the majority opinion which, we add, is in harmony with previous holdings of this court and the weight of authority.

Annbar and Continental, in their joint brief, rely on twelve points, several having sub-points. The first four points are closely related. They are that the court erred in finding:

1. "The Redevelopment Law and the Redevelopment Ordinance to be in compliance with Article I, section 28 and Article VI, section 21 of the Missouri Constitution, because said enabling laws permit the sale of property acquired by privately owned corporations by eminent domain, for un-limited private use without restrictions deemed in the public interest."

2. "That the Redevelopment Law, the Redevelopment Ordinance and Sub. Ord. 29352, were enacted pursuant to and in compliance with Article VI, section 21, of the Missouri Constitution and the 5th Amendment to the Constitution of the U. S. because said constitutional authority permits sale or disposition of redevelopment prop-. erty only subject to restrictions deemed in the public interest, whereas said laws and ordinances permit sale, disposition or use of such property free from any restrictions without any determination or procedure for determination of restrictions deemed in the public interest."

3. "That Sub. Ord. 29352 does not permit evasion of the restrictions required by said Redevelopment Law and said Redevelopment Ordinance", because the 8% earnings limitation is evaded by splitting the redevelopment benefits and duties between three entities with overlapping ownership interests, i. e. West Side, the lessees, and Hilton Hotels Corporation as the managing operator.

4. "That the granting of the power of eminent domain and tax relief to West Side and others pursuant to provisions of the Redevelopment Law and Redevelopment Ordinance does not violate Article I, section 28 and Article I, section 2 of the Missouri Constitution, and the due process and equal protection clauses of the 14th Amendment to the Constitution of the United States, because there is no assurance under said laws that a public benefit will be accomplished as discussed in points I, II and III hereof."

The underlying theory of these four points is that the Redevelopment Law, Redevelopment Ordinance and Sub. Ord. 29352 do not require that a public purpose be served.

What is the public purpose that Article VI, § 21, requires be served? That section provides that private property may be taken

to serve these purposes: " * * * the clearance * * * and rehabilitation of blighted * * * areas * * *." Section 61.020 of the Redevelopment Ordinance declares as a matter of legislative determination that the purposes to be served by Chapter 61 are the clearance, etc., and redevelopment of blighted areas, and that such purposes are public purposes. In the Kansas City Land Clearance case (270 S.W.2d 44) we said at l. c. 51: " * * * the primary object and public purpose of the law shall be the clearance and correction of any duly declared blighted * * * condition * *."

What restrictions are required by Article VI, § 21, to be imposed when property taken is sold? And who may impose such restrictions? That section provides that property acquired by eminent domain for the above purposes may be sold "subject to *such restrictions as may be deemed in the public interest.*" (Emphasis supplied.) The mandate of the constitution is not that restrictions be imposed; the mandate is that either of the legislative bodies mentioned impose *such* restrictions as that body *may* deem in the public interest. That is: the legislative branch may deem it in the public interest that the property be sold subject to no restrictions. In the Kansas City Land Clearance case, supra, we also said at l. c. 51, that after the public purpose is served " * * * the area may be sold with or without restrictions to a private enterprise, as may be deemed by Authority to be in the public interest", and at l. c. 57 that " * * * if the Authority deems it in the public interest, such property may be sold without restriction." In that case the body empowered to determine whether the public interest required that restrictions be imposed and, if so, what restrictions, was the Authority, as a public body, corporate and politic; in this case the body empowered to make that determination is the city through its legislative body, the city council.

Annbar and Continental contend specifically that § 353.150, subd. 4 of the Redevelopment Law and § 61.230(c) of the Re-

development Ordinance are in violation of the several provisions of the state and federal constitutions, because those sections permit the sale of property acquired by eminent domain without assurance that a public purpose or benefit will be served.

In the first place, the design and purpose of the Redevelopment Law is to authorize the organization of a special corporation, an Urban Redevelopment Corporation, with limited and restricted purposes and powers. In essence, this special corporation is only a redeveloper, with power to redevelop only those areas declared blighted by a constitutional charter city. The Redevelopment Law is not the sole authority under which the city adopted the Redevelopment Ordinance; other authority is granted by Article VI, § 21 which is self-enforcing and does not require enabling legislation by the General Assembly. It is pertinent here only in the field where the Redevelopment Ordinance provides for partial tax relief and limitations and restrictions on dividends and earnings of the redevelopment corporation that enabling legislation such as the Redevelopment Law was necessary. It is true that the Redevelopment Law authorizes a redevelopment corporation to acquire real property, but its right to exercise the power of eminent domain is " * * * under such conditions and only when so empowered by the legislative authority of the cities affected by this chapter." § 353.130, subd. 2.

Sections 353.150, subd. 4 and 61.230(c) do permit sale of real property acquired by the redevelopment corporation for a redevelopment project. But we must consider the whole of the Redevelopment Ordinance in determining whether safeguards or restrictions have been provided to assure that a public purpose will be served. In that connection we may consider the provisions of Sub. Ord. 29352. In sub-point A of their first point, appellants contend that Sub. Ord. 29352 may not supply the restrictions they say are necessary in the enabling laws to meet constitutional requirements. We do

not disagree with the cases they cite on this proposition; they merely are not applicable here. It is apparent that in considering the type of legislation necessary to effect the purpose of Article VI, § 21, in a city the size of Kansas City where several redevelopment projects of varying sizes in different locations under varying conditions and having different utility purposes are contemplated, the city council, as the legislative body of the city, would adopt in the first instance an ordinance in general language establishing the policy and fixing general standards that would fit the overall purpose. It would, and did, leave to subsequent ordinances the expression of the details and specific provisions, conditions and restrictions necessary to apply the policy and standards to a particular redevelopment project. The design of the Redevelopment Ordinance contemplates that supplemental action by ordinance would be necessary for each project to effect the overall purpose. For these reasons we may, and should, consider the provisions of Sub. Ord. 29352.

On pages 640 to 641, inclusive, of this opinion we related in detail the several sections of the Redevelopment Ordinance which impose the general conditions, restrictions and controls adopted by the city to assure accomplishment of the public purpose. It is doubtful whether the city could have prescribed more specific or definite restrictions in advance of each project.

■ We hold that the challenged sections of the Redevelopment Law and Redevelopment Ordinance are not contrary to or in violation of the constitutional provisions referred to by appellants.

■ Sub. Ord. 29352 contains as an integral part thereof, all provisions of the redevelopment plan for this project and all provisions of the supplemental contract later executed by the city and West Side. This ordinance requires that the 8% earnings restriction be applicable to both West Side and its lessee. It also requires that West Side, its successors and assigns, complete clearance of blight from the area and construction of the improvements. The city council has thus, by legislative determination, adopted this *means* of restricting the earnings of West Side and its lessee, and assuring accomplishment of the primary object and public purpose of the law. The means and method of restriction and assurance of accomplishment of the public purpose is for determination by the authorized legislative body, and that determination, whether wise or unwise, cannot be affected by the courts unless it appears upon allegation and clear proof that the legislative determination was arbitrary or was induced by fraud, collusion or bad faith. State on Inf. of Dalton, Attorney General v. Land Clearance for Redevelopment Authority of Kansas City, Mo., et al., supra, 270 S.W.2d l. c. 51, 52 [2]; Schenck v. City of Pittsburgh, 364 Pa. 31, 70 A.2d 612, 615; Redevelopment Agency of City and County of San Francisco v. Hayes, 122 Cal.App.2d 777, 266 P.2d 105.

What we have said above as to the effect and finality of a legislative determination of the means or method adopted to assure accomplishment of the public purpose applies to the next, as well as some of the subsequent, contentions of Annbar and Continental. These appellants contend that Sub. Ord. 29352 permits evasion of the 8% earnings restriction by splitting the redevelopment duties and benefits between three entities—West Side, its lessee, and Hilton as management operator—only two of which (West Side and its lessee) will be limited to 8% of net earnings. One fallacy in this contention is that net earnings are computed by deducting from gross earnings the cost and expense of operation of the project, and such pay as Hilton would receive in its capacity as operator would be a deductible expense of operation. §§ 353.030 (11) and 61.190(b). Sub. Ord. 29352 does not permit evasion of the earnings restriction but on the contrary endeavors to assure, and we think assures as far as possible, that the restriction will not be evaded by providing that the management operator shall not

be paid in excess of the normal fee charged in the hotel industry.

Points V and VI of the brief of Annbar and Continental are closely related and may be treated together. They are:

1. That Sub. Ord. 29352 and the Supplemental Contract are contrary to public policy and void because: (A) this ordinance authorizes a conflict of interest between the owners of (1) West Side, (2) lessee, and, (3) the management operator; and (B) West Side, as a corporation formed for a public purpose, has a fiduciary duty to the city and public with regard to contracts pertaining to the redevelopment project.

2. That the actions of the city council were induced by fraud or misfeasance because the evidence showed that conflicting ownership interests in West Side, the lessee and the management operator were not revealed to the city.

The owners or shareholders of West Side are Kenneth M. Myers and Earl E. Russell; the owners of lessee are Hilton and Kitchen and Associates; the management operator is to be Hilton, but the record does not show who its owners are. There is no showing that West Side or Kitchen and Associates own any interest in Hilton. The record shows that the ownership interests in West Side and lessee were disclosed to the city, and that Hilton would be the management operator. This ordinance and the Supplemental Contract prohibit common ownership of West Side and lessee, but do not prohibit common ownership of lessee and the management operator. Lewis Kitchen formerly owned a majority interest in West Side, and these appellants state that Myers, the present owner of a 50% interest in West Side, now has for clients both Kitchen and Hilton. The record does not support that statement, although there is an indication in the record that he did represent Kitchen when Kitchen was a part owner of West Side.

Annbar and Continental argue that Myers, as an owner of West Side, should not be permitted to make a lease with his clients, Kitchen and Hilton; that Kitchen and Hilton, as part owners of lessee, should not be permitted to make a management contract with Hilton; that West Side should not be permitted to make and enforce a contract with the city providing for such lessee and management company; that people in these positions are exposed to tendencies to corrupt; and, that they will not deal at arm's length in the public interest.

The possibility that between West Side and lessee there could be a conflict of interest adversely affecting the public purpose of this project was removed, as far as possible, when the city took the precaution of providing by ordinance that there could not be common ownership of these two. The public purpose of this project is accomplished when the blight is cleared and the area redeveloped, and it is to West Side and through it to lessee that the city looks for accomplishment of that purpose. The legislative body of the city has determined that it has imposed adequate conditions and restrictions on these two to assure that what was potentially a conflict of interest having possibilities of an adverse effect would not exist. We cannot, and should not, say that what the council has determined to be adequate assurance that an adverse conflict of interest will not exist, does in fact authorize a conflict of interest contrary to public policy. We fail to see wherein a conflict of interest exists between these two. We decline to speculate, as these appellants would have us do, that West Side might assign its contract with the city to another in which the owners of lessee would have an interest. Should that happen it can be met at the appropriate time by those public authorities charged with the responsibility of enforcing the redevelopment plan and ordinance. As to Hilton, in its capacity as management operator, it does not come into the picture until after the public purpose has been accomplished. And at that point it enters the picture only as the agent, servant or employee of the lessee. The only possible conflict suggested is that at that

point these three might, or would have the temptation to, somehow evade the 8% earnings restriction. However, first, the limitation on net earnings is applied to the combined cost of both West Side and lessee, so that, as between these two, there cannot be an evasion of the earnings restriction; second, that which is paid to the management operator is an expense of operation, authorized by both the statute and ordinance, as deductible from gross earnings. By Sub. Ord. 29352 and the Supplemental Contract management fees and charges are limited to those normally charged in the hotel industry for those services. The "normal" charge can be determined with some certainty. West Side is required to file annual financial reports with the city. Through that information the city can determine whether the redevelopment plan and contract are being breached by an evasion of the earnings restriction through a charge of excess management fees, and take such action as is deemed necessary.

As stated, West Side is a private corporation; yet, it was organized to serve a public purpose. It does have a duty to the city and public with regard to contracts pertaining to the redevelopment project. But it has not been demonstrated wherein it has breached that duty or wherein the definite possibility lies that it will do so.

The cases cited by these appellants in support of their points V and VI are not applicable to the facts of this case. Those from which they quote are: Pacific R. Co. v. Seely, 45 Mo. 212; Witmer v. Nichols, 320 Mo. 665, 8 S.W.2d 63.

Annbar and Continental, in point VII of their brief, contend that Sub. Ord. 29352, grants a tax exemption in violation of Article X, § 6 and Article I, § 2, of the Constitution of Missouri and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States in that the ordinance grants tax relief to: (1) a purchaser from West Side, and (2) the lessee. Specifically, they say that under the Redevelopment Law and Redevelopment Ordinance the only person who can be granted partial tax relief is an urban redevelopment corporation, but that this ordinance grants tax relief to *any* purchaser from West Side. They also say that in automatically granting tax relief to *any* purchaser, this ordinance attempts to bind a future council and relieve it of its discretion to refuse tax relief to a purchaser from West Side. The ordinance *does* provide that the tax relief granted real property of West Side under the Redevelopment Law and Ordinance shall inure to a purchaser, meaning *any* purchaser. But, that is not to say that the granting of such relief is in violation of the constitutional provisions referred to. Appellants contend that § 353.110 limits tax relief solely to urban redevelopment corporations. However, on this point, they ignore § 353.150, subd. 4. Section 353.110 provides for partial relief from taxation of the real property of an urban redevelopment corporation "so long as [it] is owned by an urban redevelopment corporation and used in accordance with an authorized development plan * * *." The Redevelopment Law, in § 353.150, subd. 4, recognizes and contemplates that property of a redevelopment corporation may be sold, and that the purchaser may be one other than a redevelopment corporation. That section authorizes partial tax relief on the land acquired by such purchaser under certain circumstances; it provides that if " * * * the purchaser of such real property of such redevelopment corporation shall continue to use, operate and maintain such real property in accordance with the provisions of any development plan, the legislative authority of any city affected by the provisions of this chapter may grant the partial tax relief provided in section 353.110; * * *." By § 353.150, subd. 4 the legislature has provided that partial tax relief may inure to a person other than an urban redevelopment corporation, and the public purpose of the law is encouraged by further providing that this relief may continue only so long as the property is used in accordance with the development plan. Article X, § 7, of the con-

stitution expressly authorizes the general assembly to provide for partial relief from taxation of lands devoted to the purpose of rehabilitation of blighted areas by such method and upon such terms and conditions as it may prescribe. That section provides partial tax relief for the lands as distinguished from relief to a particular owner of the land; it does not prescribe the class of persons owning the land to whom the relief may inure. That section empowers the general assembly to prescribe the method, terms and conditions under which that relief may be enjoyed, which includes the power to provide that partial tax relief shall inure to the benefit of a private urban redevelopment corporation *and* any purchaser from it, so long as that purchaser continues to use the land for what has been determined to be a public purpose. In Land Clearance for Redevelopment Authority of City of St. Louis v. City of St. Louis, supra, 270 S.W.2d 1. c. 64–65, the constitutionality of § 353.110 was challenged as granting a tax exemption to a private urban redevelopment corporation. We held that the provisions of § 353.110 were expressly authorized by Article X, § 7, and did not conflict with Article X, § 6.

We now hold that the provisions of Sub. Ord. 29352 are in accordance with § 353.150, subd. 4; that the latter section is authorized by Article X, § 7; and that neither § 353.150, subd. 4 nor Sub. Ord. 29352 conflict with Article X, § 6, or the equal protection clause of either constitution.

Appellants complain that Sub. Ord. 29352, in automatically granting tax relief to a purchaser, attempts to bind a future city council and deprive it of its discretion to refuse tax relief to a purchaser from West Side. As stated, the ordinance does extend partial tax relief on the land to a purchaser, but that relief is extended only so long as the land is used in accordance with the development plan and the whole period of tax exemption may not exceed 25 years. If it is not used for this purpose by the purchaser, then it shall be assessed for ad valorem taxes on its full true value. The language of § 353.150, subd. 4 is such that we deem it to be the intent of the legislature to empower the city council to determine at the time a redevelopment plan is approved whether or not tax relief, limited as above indicated, would be extended to a purchaser. A contrary construction would be inconsistent with reason. A contrary construction could possibly make mortgage financing impossible and render impotent the Redevelopment Law. If a future city council is tethered by the Redevelopment Law and this ordinance as to a purchaser, it is tethered for a period no longer than it would be as to a redevelopment corporation. The general assembly has determined that the partial tax exemption period shall extend for not to exceed 25 years and that this is in the public interest and serves a public purpose. Determination of the period of time during which tax relief is extended for these purposes is left by Article X, § 7, to the general assembly. We may not determine that the term prescribed by the general assembly is unreasonable, nor may a future city council. However, a future city council is not completely tethered by the ordinance; if it determines that the land is not being used by the purchaser in accordance with the development plan, the land shall be assessed at its full true value. City of St. Louis v. Cavanaugh, 357 Mo. 204, 207 S.W.2d 449, cited by these appellants, is distinguishable from this case.

Appellants also complain that Sub. Ord. 29352 in effect grants tax relief to the lessee, an entity not a redevelopment corporation. The lessee will construct the improvements and will be entitled to their use as lessee for a period of at least 25 years, but the legal title to the improvements immediately vests in West Side. The partial tax relief afforded the real property and the improvements inures to the direct benefit of the owner and, of course, indirectly or incidentally, inures to the lessee who has contributed to the accomplishment of the public purpose and bound itself to the 8%

earnings restriction. We held above that the fact that partial tax relief may inure to the benefit of a purchaser from West Side does not violate the constitutional provisions referred to; for the same reasons, we hold that such indirect or incidental relief as may inure to lessee does not violate those provisions. Moreover, by the time such relief may be incidentally afforded lessee the public purpose, i. e., the clearance and redevelopment of the blighted area, will have been accomplished.

In point VIII of their brief, Annbar and Continental contend that the Redevelopment Law and Redevelopment Ordinance are not clear and are ambiguous when applied to Sub. Ord. 29352 because the law and ordinance contemplate one redevelopment corporation bound by that law and ordinance and a development plan; that the Redevelopment Law and Ordinance are vague and unintelligible when applied to the three-headed association (West Side, lessee, and management operator) permitted by Sub. Ord. 29352. Closely allied to this point is their point XI that the court erred in denying discovery and refusing evidence on the meaning of the Redevelopment Law, Redevelopment Ordinance and Sub. Ord. 29352.

These appellants argue that when the Redevelopment Law and Ordinance are applied to this three-headed association it is impossible to determine. (1) whose cost will be the basis for fixing the 8% earnings restriction, (2) what is the cost basis of each of these entities, (3) which contributors to cost are restricted in earnings, (4) how or to whom the amortization deduction shall be applied, (5) what effect will be had on the earnings restriction in the event of enlargement of the project by one of the three entities, and, (6) what disposition will be made of surplus earnings in event of sale of the project. The matters they say are impossible of determination and demonstrate the vagueness and ambiguity of the Redevelopment Law and Ordinance when that law and ordinance are applied to the

owner, the owner's tenant, and that tenant's servant, are treated in their argument as sub-points, and posed as that many questions, with some of those sub-points containing from two to nine additional questions, some of which contain more than one part. Those questions having substance are determined in other parts of this opinion. We see no need to further lengthen this opinion by discussing separately each question and hypothetical situation for in examining them we have reached the same end result so far as the basic point made is concerned. It is sufficient to say that we have closely examined the Redevelopment Law and Ordinance in the light of those questions and find and hold, as did the trial court, that that law and ordinance are not vague and ambiguous when applied to Sub. Ord. 29352 and the persons mentioned therein.

Contending that this law and ordinance are vague and ambiguous, Annbar and Continental, by interrogatories and depositions, sought evidence from West Side, Hilton, and Kitchen and Associates, their representatives and attorneys, (all interested parties, except the City) on the construction they gave the statutes, ordinances and contract. The trial court held that the Redevelopment Law and Ordinance are not vague and ambiguous and that the extrinsic evidence sought and offered in aid of construction is irrelevant. We held above that this law and ordinance are not ambiguous, and now hold that the trial court did not err in denying discovery and excluding evidence on the meaning thereof. As stated by appellants, "It is elementary that extrinsic evidence is not admissible in the absence of ambiguity." It is so elementary that it does not require the citation of authority.

Annbar and Continental contend in their point IX that the redevelopment plan does not contain a detailed statement of the proposed method of financing the project as required by § 61.070(n); that for this reason the court erred in finding that Sub.

Ord. 29352 complied with the provisions of the Redevelopment Ordinance. In essence, this contention is that the statement of the proposed method of financing contained in the redevelopment plan is not in sufficient detail.

 We need not set out the method of financing. It is sufficient to say that we will not substitute our judgment for that of the city as to how "detailed" West Side's statement of financing is required to be. The city plan commission and the finance committee of the council, after public hearings, have approved the redevelopment plan as containing a statement of the method of financing in sufficient detail; and, there has been a legislative determination by the city council that the method and plan are sufficient. Absent allegations of fact and clear proof that approval of the plan was arbitrary or the result of fraud, collusion or bad faith, it will be accepted by the courts as sufficient; there is no allegation or proof that its approval was arbitrary or the result of fraud, etc. State on Inf. of Dalton v. Land Clearance for Redevelopment Authority of Kansas City, supra, 270 S.W. 2d 1. c. 52 [2]; Reis v. Metropolitan St. Louis Sewer District, Mo., 373 S.W.2d 22, 27, 28 [8, 9]; 62 C.J.S. Municipal Corporations § 199, pp. 373–374.

Arguing that a more detailed statement of the method of financing was necessary so that the City might exercise reasonable judgment in approving or disapproving the plan, appellants state that one element that should have been considered is whether West Side is financially responsible and able to perform the redevelopment contract or, in the event of breach, to respond in damages; that another element that should have been considered is the legal liability of the other proposed investors to perform as represented by West Side. By a motion to produce directed to West Side and interrogatories propounded to West Side, Kitchen, Block, Myers, and a representative of Hilton, appellants sought information and items they say were relevant to these ele-

ments the city should have considered. The court sustained objections to many of these interrogatories and denied production of certain items, apparently for the reason that they were not relevant to the issues. In point X of their brief, appellants contend that the court erred in denying discovery of these matters.

 As stated above, the power and obligation to make a determination as to whether the method of financing is in sufficient detail and whether the parties proposing the plan are financially and otherwise responsible is first vested in the legislative body of the city which made that determination before this suit was filed. We cannot say the council did not consider the financial responsibility of the redeveloper, and others, in making its determination, or that it did not advise with counsel and consider the legal liability of the other investors. There is no need to set out the interrogatories to which objections were sustained or items requested which were denied. The information sought by discovery procedures was not relevant to the issues. The trial court ruled correctly. The point is denied.

As stated in the first part of this opinion, appellant, Tomlinson, was permitted by the trial court to intervene as a party plaintiff over the objection of Annbar and Continental. After Tomlinson was permitted to intervene, Annbar and Continental filed a motion to dismiss her petition. The grounds for dismissal were that the intervention was the result of wrongful collusion and cooperation between Tomlinson and West Side on a pretense of controversy between those parties; that there was in fact no controversy; that the purpose of intervention was to hinder Annbar and Continental in the prosecution of their action, compromise their position and wrongfully wrest control thereof from them, and aid West Side in its defense. Suggestions in support of their motion stated (1) that Tomlinson's intervention was without any prior consultation or discussion

with these plaintiffs or their attorneys, (2) that in cooperating with West Side, Tomlinson had, within a week after answers had been filed to her petition, insisted before the assignment division that the court assign and set the case for an early trial, and, (3) that they believed, and would prove by deposition, that West Side (a) solicited the intervention of Tomlinson, (b) conferred with Tomlinson and her attorneys and procured their cooperation to the detriment of Annbar and Continental and to the pretended cause of intervenor, and, (c) did extensive research for and prepared or assisted in preparation of her pleadings. By motions to produce certain records and papers and by interrogatories addressed to Tomlinson and West Side, and later by depositions, these plaintiffs sought evidence to prove the allegations of their motion to dismiss. On June 26, 1964, at a hearing on the motions to produce and objections to interrogatories, the court observed that much of the information requested (such as: time sheets and work records of attorneys in research, preparation of pleadings, conferences and telephone calls, and bills submitted to Tomlinson for services rendered, etc.) was not subject to discovery, because it was privileged. During this hearing the following colloquy took place between court and counsel:

"THE COURT: I still don't understand, at all, how that can damage your position.

MR. SKEER: I lose control of many facets of my case, Your Honor, with another plaintiff, who is working against me.

THE COURT: You are not going to lose control of any facet of your case as far as I am concerned.

MR. SKEER: Well, I—Suppose, Your Honor, that I wanted to dismiss this case and refile it in Federal Court. I can't—

THE COURT: There is nothing to prevent it.

* * * * * *

THE COURT: Would you like to dismiss your lawsuit?

MR. SKEER: No, Your Honor, I don't intend to do that, but I am merely pointing out—

THE COURT: Well, then that is a circumstance that doesn't hurt you because the example you give, you promptly tell me you don't have that in mind anyhow.

MR. SKEER: Your Honor please, when you have witnesses on the witness stand and you are trying a case, a lawyer tries to present his evidence in his best way, and when a co-plaintiff is not cooperating, and is working contrary, his cross-examination of my witnesses, or his direct—

THE COURT: Don't you think that is something that I have some discretion to control? I do.

MR. SKEER: Well, certainly you do, Your Honor, but—

THE COURT: And I shall do it.

MR. SKEER: But it can be legally proper questioning and yet detrimental strategically to the progress of the case.

THE COURT: Well, those are matters that I think the trial court not only can but has a positive and permanent duty to control.

MR. SKEER: I agree with you, Your Honor.

THE COURT: And I assure you that will be done."

The court sustained objections to the motions to produce and most of the objections to interrogatories. Thereafter, Annbar and

Continental took the depositions of several interested persons and their attorneys to support the allegations of their motion to dismiss. Many questions propounded at these depositions were not answered on advice of counsel. The questions unanswered were certified to and examined by the court, and the objections sustained on trial day, August 3. On the same day, the court overruled the motion to dismiss intervenor's petition, and the cause proceeded to trial. Grounds stated for objections to questions asked at the taking of these depositions were, in general, that the information requested was privileged and not relevant to the issues, and that counsel for Annbar and Continental had no right to make an inquiry on behalf of the court as to the alleged collusion between Tomlinson and West Side.

In point XII, their last point, Annbar and Continental contend that the court erred in overruling their motion to dismiss Tomlinson's petition. In sub-points they contend that the court erred in (a) refusing to investigate their charge of collusion and in overruling this motion without such investigation, (b) denying discovery directed toward obtaining evidence relevant to their charge of collusion, and, (c) finding that Tomlinson did not appear at hearings of the city plan commission in support of other and previous redevelopment plans of West Side and corporations merged into it.

Their position is that it is the duty of the court to investigate a charge that pending litigation is collusive or pursuant to secret agreement and cooperation between parties. They cite Meeker v. Straat et al., 38 Mo.App. 239, 243 [1] which holds that an amicable suit may be brought to determine the respective rights of parties thereto; but if its purpose be to affect rights of one who is not a party, it is collusive, and will

not be entertained.[4] We do not disagree with the holdings in these cases; we agree with the principles they announce. However, in none of those cases is a situation presented like the one here. We have found no cases based on similar facts. A general statement in 1 C.J.S. Actions § 19, p. 1060, cited by both sides, seems to start us in the right direction: "The question as to the fictitious or collusive character of the action may be * * * brought to the attention of the court by * * * a person * * * who would be affected by the decision; and *where the court has reason to believe* that an action is of this character it should require the submission of evidence to the contrary * * *." (Emphasis supplied.) See also State ex rel. Chandler v. McQuillin, supra, 130 S.W. 1. c. 20.

In Joplin Waterworks Co. v. Jasper County, 327 Mo. 964, 38 S.W.2d 1068, 1075 [4, 5], we said: "'* * * the mere circumstance alone that the proceeding is an amicable one, or that the parties have agreed as to the facts upon which the proceeding is to be submitted for determination, is not determinative of the moot character of the proceeding, or that the proceeding is collusive and pretended. *The determinative factor is whether the proceeding presents an actual controversy involving adverse interests between the parties.'*" (Emphasis supplied.)

When the court ruled on appellants' motion to dismiss intervenor's petition, it had before it (1) Tomlinson's verified motion to intervene (which it had sustained some two months before) alleging, inter alia, that as a property owner within the redevelopment area her interest was inadequately represented by existing plaintiffs not property owners therein; (2) appellants' allegations of suspicion of collusion; (3) the

---

4. Other cases cited in support of this position are: City of Sedalia ex rel. Gilsonite Const. Co. v. Montgomery et al., 109 Mo.App. 197, 88 S.W. 1014, 1016; Williams v. Van Deusen et al., 203 Mo. App. 162, 219 S.W. 395, 397; Cape Girardeau, etc., v. Southern Illinois & Missouri Bridge Co., 215 Mo. 286, 114 S.W. 1084, 1085–1086; and a dissenting opinion in State ex rel. Chandler v. McQuillin, 229 Mo. 523, 130 S.W. 9.

time consuming, unavailing efforts of appellants to prove their allegations; (4) an admission that Tomlinson had insisted that the case be set for an early trial date; and, (5) an indication from counsel for Annbar and Continental that one of their chief concerns was that Tomlinson's intervention could be "detrimental strategically to the progress of the case." The court also had before it affidavits of Tomlinson and her attorney, and attorneys for West Side, that there was no agreement between West Side and Tomlinson for the purchase of her land and no agreement whereby West Side, or any person other than Tomlinson, would pay the fees of her attorneys for the prosecution of this suit.

The court believed, and found, with good reason, that it had before it an actual controversy between Tomlinson and West Side and that their interests were adverse. Under these circumstances the court was not obligated to require proof that the action was not collusive, or to make or direct an investigation of the charge. There was nothing to be accomplished by an investigation, except the probability of delay of a controversy of public moment which was entitled to a speedy determination. The question of whether the intervention of Tomlinson was the result of collusion is largely one of fact. Under the record presented, we see no reason to overthrow or disturb the trial court's determination of that question, or its ruling on the motion to dismiss or its rulings on the evidence sought by appellants on this question.

We find and hold that the action presented an actual controversy involving adverse interests between Tomlinson and respondents.

The judgment is affirmed.

All concur; and STONE, Special J., concurs.

DONNELLY, J., not participating because not a member of court when cause was submitted.